**UNITED STATES of America**

v.

**Joseph BONANNO et al., Defendants.**

United States District Court
S. D. New York.
Jan. 12, 1960.

---

12. Voci v. Storb, 3 Cir., 235 F.2d 48.

13. 344 U.S. at page 201, 73 S.Ct. at page 234.

See also, D.C., 178 F.Supp. 62.

Harry H. Oshrin, Louis Susman, Maurice Edelbaum, New York City, Remo A. Allio, Endicott, N. Y., Franken, Kramer, Bam & Nessen, New York City, Maurice Nessen, New York City, of counsel, David M. Markowitz, New York City, Henry C. Lavine, Cleveland, Ohio, Moses Kove, New York City, Anthony Callandra, Newark, N. J., Edward H. Levine, Abraham Brodsky, New York City, Frank G. Raichle, Buffalo, N. Y., George Feit, New York City, S. Thomas Bianco, Pittston, Pa., Henry G. Singer, Brooklyn, N. Y., Louis Mansdorf, New York City, Fred H. Mandel, Cleveland, Ohio, Joseph K. Guerin, New York City, for defendants.

Milton Wessel, Chief, White Plains, N. Y., Marvin B. Segal, Deputy Chief, New York City, Louis T. Gallo, East Patterson, N. J., Edward Brodsky, John E. Spriyyo, Michael A. Berch, Brooklyn, N. Y., for the United States.

IRVING R. KAUFMAN, District Judge.

### I. Background.

On November 6, 1959 and after the trial of this case had been under way for over a week, the defendants moved for an order suppressing all evidence procured through law enforcement activities in and around Apalachin, New York, on November 14, 1957.[1] Their

---

1. The only evidence that the jury was allowed to consider, which stemmed from the police procedures characterized by the defendants as illegal, consisted of statements made by the defendants and co-conspirators to the investigating officers.

motions were made after a considerable portion of that evidence had been offered without objection. Treating the motions as made pursuant to Rule 41, Federal Rules of Criminal Procedure, 18 U.S. C.A., it is clear that they were not timely.[2] The defendants had been given several months prior to trial in which to prepare their respective cases, and all the facts bearing upon the practices now challenged were fully known to them during that period. The reasons advanced by counsel for their delay were totally insufficient. See Tr. 2299–2300.

Nevertheless, since the instant motions raised constitutional issues of central importance to the prosecution of the case, I determined that the defendants should be given every opportunity to present the substance of their claims. I therefore ordered a hearing on the legality of the challenged police procedures to be held on November 16, 1959. That hearing was held *in camera,* as requested by the defense (Tr. 2314–14a), to assure that no facts which might be prejudicial to the defendants would be brought to the attention of the jury, even accidentally. Though given the opportunity, the defense did not choose to present any witnesses. The govern-

ment presented only one witness, Sgt. Edgar D. Croswell of the New York State Troopers, who was in charge of the police investigation at Apalachin.[3] He was subjected to the most searching cross-examination by the defense.

On the basis of the facts established at the hearing, and those which had already been brought out during the government's case in chief, I denied the defendants' motions to strike and suppress testimony, in a preliminary opinion filed on December 2, 1959. In that opinion I presented my conclusions without factual detail or elaboration. I pointed out that to have done otherwise at that time might have defeated the purpose for which the hearing was held *in camera.*

At the present time, however, the trial has been completed,[4] and the factual material developed at the hearing can in no way prejudice the defendants. A full and clear understanding of the questions presented by these motions requires a more detailed opinion. I have decided, therefore, to file this opinion, utilizing the facts established at the hearing and during the entire course of the trial, in order to clarify the grounds and extent of my earlier ruling.[5]

These statements were not offered in evidence as admissions or confessions by the defendants, for without exception they were exculpatory in nature. They were admitted as evidence of a conspiracy to obstruct justice by giving false and evasive statements to all authorities seeking to learn the true nature and purpose of a certain meeting. Thus the evidence challenged by these motions was not "incriminating" when made, and became so only in the manner a false denial of criminality might become the basis of a perjury charge.

2. Rule 41(e) provides: "The motion [for return of property and to suppress evidence] shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing."

3. It was stipulated that the other officers who took part in the investigation would, if called, give substantially the same testimony as Sgt. Croswell. Tr. 2305–07.

4. The Court directed an acquittal as to one defendant. The remaining twenty were convicted by the jury, which deliberated approximately 17 hours.

5. I shall not in this opinion concern myself with the evidence in this case which clearly established the falsehood of the defendants' statements to Croswell and other law enforcement officers and bodies, including federal grand juries. Suffice it to say that the jury found incredible the defense's position that over sixty individuals, many from California, Ohio, Texas and other distant places in the United States, and even Cuba, came together at Joseph Barbara's home located in a small, hard-to-find village called Apalachin at approximately the same time (a mid-week working day) without any plan or prearrangement to meet at his home. The jury must also have disbelieved the defendants' statements detailing their purposes for being at the gathering, which ranged from visiting a sick friend, to attending a social function (no women or children were present), to

## II. Facts.

Joseph Barbara, Sr., at whose estate the gathering took place, had long been under investigation by the New York police, including Sgt. Croswell. They believed him to have been involved in the manufacture and distribution of illegal alcohol in Pennsylvania. He had been picked up on suspicion of murder on three occasions, and was suspected by the police in the Apalachin area of having been involved in two murders and two disappearances. Barbara, Sr. had associated and met with racketeers in the Endicott, N. Y. area and was generally considered by investigators as being behind the rackets in Broome County. Tr. 2082–84. In 1946 Barbara was convicted of an OPA violation involving the illegal acquisition of 300,000 pounds of sugar (Tr. 2087), a prime ingredient in the manufacture of alcohol.

In 1949 defendant Pasquale Turrigiano was arrested for operating a still. Barbara made payments on Turrigiano's truck, conferred constantly with him during the period of investigation and supplied sugar to Turrigiano. Tr. 2083–4, 2087. Barbara also had connections with one Anthony Ziamba, who had also been arrested for illegal alcohol activities. Tr. 2084.

In October 1956 a man named Galente was arrested for a traffic violation. One of his companions, who ran off, was Frank Garafolo. Upon investigating the incident the police discovered that Garafolo had registered at the Arlington Hotel in Binghamton, N. Y. with Louis Volpe, Joseph Bonanno (a defendant), John Bonventre (a co-conspirator, not indicted) and Joseph Barbara, Sr., who had reserved the rooms and whose local Canada Dry bottling company paid the hotel bills. Galente, when arrested, exhibited the driver's license of Joseph Di Palermo, who had a long list of alcohol violations. Tr. 2084–85, 2156.

On November 13, 1957 Sgt. Croswell observed Barbara, Jr. register for three rooms at the Parkway Motel (near Apalachin) in the name of the Canada Dry bottling company, owned by his father. Tr. 2190. When later that day two persons in an Ohio car arrived and took possession of one of the rooms, Sgt. Croswell asked the proprietor to have the two of them sign a registration card. The persons refused to do so. Tr. 2110.

That evening Sgt. Croswell contacted Agents Ruston and Brown of the United States Alcohol and Tobacco Tax Unit. Tr. 2042. He was aware of the 1956 gathering in which Barbara, Sr. had taken part, of Barbara's close association with Turrigiano and Ziamba and his conviction for illegal acquisition of 300,000 pounds of sugar, a prime ingredient in the manufacture of alcohol, and thus believed that something having to do with their jurisdiction was brewing. Tr. 2108–09, 2207.

At approximately 12:30 p. m. on November 14, 1957, the Troopers and Federal Agents drove into the Barbara parking area. Vasisko, who was driving, testified that there was never any intention to go past that point (Tr. 1423–24), and in fact the car went no further. The officers stayed only a few minutes, during which time they observed some persons on the property and some 20 to 25 cars parked in various places, the bulk of them parked away from the normal parking area and near the Barbara barn. Tr. 2113–15, 2239, 2242, 2246. Croswell testified that he had never seen so many cars on the Barbara property before. Tr. 2240–42.

buying real estate, to discussing the acquisition of beer equipment or a truck, to having a damaged car fixed. I emphasize that the jury must have found these statements false, since the jury was charged specifically that before any defendant could be found guilty, it had to find that that defendant had not told the truth concerning the true nature and purposes of the gathering at the Barbara estate. Furthermore, the jury was charged that a verdict of guilty could not be returned merely by a comparison of statements, but had to be based on affirmative proof supplied by the government which would satisfy the jury of the falsity or evasiveness of the statements.

The officers immediately backed their car off the Barbara property and, after a discussion among themselves, decided to stop the cars on the public road as they came from the estate in order to determine who was in them. Tr. 2117–19, 2238–39. There is much evidence in the record to substantiate the fact that the officers were observed by individuals present at Barbara's home, including Mrs. Barbara, during their brief drive into and out of the parking lot (See, e. g. Tr. 1902, 2436–37, 3161, 3675a, 4665) and while in the parking area Croswell observed several men move quickly from one building toward another. Tr. 760, 1233.

At about 12:50 p. m. the checkpoint was set up on the public road. Though the police car was at times blocking the road (Tr. 1187–88), for the most part it was drawn up on an adjacent field and the cars were waved to a halt. See Tr. 1261.

Several vehicles that arrived at the checkpoint were allowed to pass through without being stopped, because the occupants were known to Sgt. Croswell and he foresaw no difficulty in "checking them out" later, if necessary. Tr. 2120–22. When defendant Cannone's car arrived, Cannone was found to be lacking his automobile registration. He lived in the area, was known to Sgt. Croswell, and Sgt. Croswell merely sent him home to get his registration and report to the Vestal, N. Y. substation (Tr. 2121) which Cannone voluntarily did. Defendant Turrigiano, whose alcohol violation reputation was also known to Croswell, arrived at about the same time, and he too was merely told to proceed unaccompanied to the Vestal station. Tr. 2122.

Between 1:00 and 2:00 p. m. a car driven by defendant Bufalino arrived. One of the passengers in that car was conspirator Vito Genovese, whom Croswell knew had an extensive criminal background. When Genovese refused to answer any questions he was not pressed to do so, and after 15 or 20 minutes the Bufalino car was allowed to proceed on its way. Tr. 2125–26.

At approximately 2:00 p. m., Croswell was informed that men had been observed running through the woods on or near the Barbara estate. Tr. 2122. It was a rainy and rather raw fall day. At this point, according to Sgt. Croswell, " * * * we believed then that we were right in our assumption that something was going on up there, and very possibly an alcohol conspiracy." Tr. 2123. After 2:00 p. m. Croswell set up a procedure whereby the persons stopped were sent to Vestal rather than being questioned on the open road.[6] It was at that time raining, the police had very limited personnel, and the cars leaving the Barbara estate had begun to do so with such rapidity that a "pile up" on the road was beginning to take place. Tr. 2124–28.

No one objected to going to the Vestal station. There, the men were questioned to elicit name, age, address, occupation and criminal record. They were also asked their purpose for being at Apalachin. Once a person was thus identified he continued on his way and the men were questioned as quickly as possible. No one was questioned more than one-half hour. Tr. 2132–36.

Though they were given an opportunity to do so, no defendant presented any evidence at the in camera hearing that he was in any way put under pressure or coerced while at the checkpoint or at the Vestal substation.

About twenty-five out of the approximately sixty persons questioned had criminal records. Tr. 2311.[7]

6. Thus, the great majority of the defendants were questioned after the police were aware that persons at the gathering were fleeing into the woods and after Vito Genovese and Pasquale Turrigiano were identified.

7. In stating the above facts I have taken into account the matter brought out by the defendants in cross-examining Sgt. Croswell. I have also considered the statements of the conspirators dealing with the event on November 14, which were put in evidence during the course

III. The Legality of the Procedures on November 14, 1957.

A. *The Right to Stop and Question.*

The defendants contend that the above-described police procedures constituted an illegal arrest and an unreasonable search and seizure, and that all evidence, of any kind, stemming from those procedures is inadmissible in a Federal criminal trial.[8] As a basis for their contentions the defendants rely upon the Fourth Amendment,[9] and other rules established by the Supreme Court for the administration of justice in the Federal Courts. See, e. g. Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

■ It is axiomatic that before a finding can be made that there has been an *illegal* arrest, a showing must be made that there has been an arrest. Thus, an immediate problem of definition arises. Joined to that problem, is the danger, that the defining process will cast an air of deceptive simplicity over the broader task actually faced by the Court. One must never forget that this is a decision on the rights of individuals and the duties of government, and not an abstract exercise in definition. In dealing with words there is always a temptation to allow them to become separated from their objective correlatives in the everyday world, and to treat them as if they have, or ought to have, one single simple meaning, unaffected by the contexts in which they occur and divorced from the world of things and events which give them their content and justification.

"Arrest" is just such a word, not only because it is necessarily unspecific and descriptive of complex, often extended processes, but because in different contexts it describes different processes, each of which has built up, in both legal and common parlance, sharply divergent emotional connotations.

■■ For instance, it is quite clear that under New York law[10] no arrest, in its technical sense, took place on November 14, 1957. The New York Code of Criminal Procedure, § 167, defines an arrest as the taking of a person into custody that he may be held to answer for a crime. See Hook v. State, Ct. Claims 1958, 15 Misc.2d 672, 181 N.Y.S. 2d 621, 625; People v. Yerman, Oneida County Ct. 1930, 138 Misc. 272, 246 N.Y.S. 665. It is clear that a technical arrest demands an intent on the part of the arresting officer to bring in a person so that he might be put through the steps preliminary to answering for a crime such as fingerprinting, booking, arraigning, etc.

■■ The whole tenor of Sgt. Croswell's testimony, however, both at the trial and during the special hearing, was that he did not intend to hold any of the conspirators to answer for a crime, but was rather conducting an investigation, to which the information possessed by the conspirators might be of signal value.[11]

---

of the trial. See, e. g. Tr. 3161 (Castellano); 4075, 4085 (Civello); 2397 (Evola); 2693 (Guarnieri); 2437 (Lombardozzi); 3676 (Miranda); 4630, 4699–4701 (Montana); 4665, 4671, 3116 (Sciandra). Taken together, these statements do not provide a substantially different picture of the events than the one set forth in the text.

8. There is no contention by the government that the so-called "silver platter doctrine" ought to apply, since the evidence establishes that federal agents took an active part in the police procedures now challenged.

9. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

10. State law will govern on what constitutes a technical arrest, in the absence of specific federal statute. See United States v. Di Re, 1948, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210.

11. It must be borne in mind that Sgt. Croswell and his colleagues Trooper Vasisko and Agents Rusten and Brown, believed that the crime of conspiracy to

■ Nor does the police activity described above satisfy the requirements of what might be termed the "common" definition of arrest. A layman, if asked if he had even been arrested, would not be likely to describe situations where he had been stopped by a police officer, or situations where his car had been stopped, or even situations where his questioning had been continued at a police station, as arrests. The common conception of an arrest, like the technical definition, comprehends the formal charging with a crime.[12]

But, to rely solely upon the fact that there was no technical arrest, or no arrest as that term is commonly understood, would be to fall into the very semantic trap alluded to above. The problem, as I see it, is not whether the challenged police procedures constituted an "arrest", but whether these procedures were of such a character that all evidence stemming from them must be suppressed.

■■ That every temporary restriction of absolute freedom of movement is not an illegal police action demanding suppression of all resultant evidence is accepted in federal courts,[13] though it is a proposition incompletely articulated. I believe that the relative dearth of authority in point can be explained by the fact that few litigants have ever seriously contended that it was illegal for an officer to stop and question a person unless he had "probable cause" for a formal arrest.

■ While the Fourth Amendment may be construed as encompassing "seizure" of an individual, it cannot be contended that every detention of an individual is such a "seizure". If that were the case, police investigation would be dealt a crippling blow, by imposing a radical sanction unnecessary for the protection of a free citizenry.[14] Under such a theory, a policeman could not stop and question a person standing next to a bloody corpse. If he did so, before hav-

violate state and federal laws might be taking place. It is in the nature of the crime of conspiracy that there be a meeting of minds or an agreement among individuals to violate the law. The rationale behind the creation of this offense is that Congress believed that the mere agreement among numbers of persons to commit an offense was itself a danger to society demanding classification as a crime. See Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 922–25 (1959). It is well settled that while an overt act is necessary for conviction of the offense, it is not necessary to prove that the conspiracy was successful. It would appear that no purpose would be served, and indeed the public would be injured, by forbidding the police to investigate a conspiracy at a stage in its development before it successfully results in a more palpable crime.

12. See also American Law Institute, Code of Criminal Procedure, § 18: "Arrest is the taking of a person into custody that he may be forthcoming to answer for the commission of any offense."

13. See Green v. United States, 1958, 104 U.S.App.D.C. 23, 259 F.2d 180, 181; Poulas v. United States, 9 Cir., 1938, 95 F.2d 412, 413; Weathersbee v. United States, 5 Cir., 1933, 62 F.2d 822, certiorari denied 289 U.S. 737, 53 S.Ct. 656,

77 L.Ed. 1485; cf. Ellis v. United States, 1959, 105 U.S.App.D.C. 86, 264 F.2d 372, 374, certiorari denied, 359 U.S. 998, 79 S.Ct. 1129, 3 L.Ed.2d 986.

14. In England, where solicitude for the rights of persons suspected of crime has been well established, the basic distinction between the closely allied police procedures of investigating a suspected crime and gathering evidence against a suspected person is well understood. In the "Judges' Rules", formulated by the English judges to codify the limits of permissible police investigation, the first rule is:

"When a police officer is endeavoring to discover the author of a crime, there is no objection to his putting questions in respect thereof to any person or persons, whether suspected or not, from whom he thinks useful information can be obtained." Devlin, The Criminal Prosecution in England, p. 31. (Sir Patrick Devlin is a Justice of the High Court of England.)

Justice Devlin goes on to develop this distinction at some length. The English judges are aware that there is often a fine line between investigation of a crime and an attempt to procure evidence against a specific suspect, but they are of the opinion that while there ought be no opportunity to coerce an admission from

ing probable cause to believe that he had committed the crime, and then released him, and subsequently decided on the basis of further checking into the individual's activities that he was likely to be the murderer, the policeman could not testify to the presence of the suspect in the vicinity of the victim because it would be testimony about matters learned upon an "illegal arrest".

All would agree that the officer in the situation referred to would be justified in detaining the suspect and questioning him with a view toward establishing his identity and his reasons for being on the scene. This is so even though the policeman could not know at the time of the stoppage that a crime had been committed, since the corpse could quite likely have been the product of accident or suicide. Furthermore, could it be seriously questioned that it would be good police activity for the officer to question each member of the limited group gathered at the scene. In such a situation it would be almost certain that not everyone present was a participant in the crime and likely that no one present had participated.[15]

It must be emphasized that all the hypothetical cases presented are, as is the instant case, sharply distinguishable from a police "roundup". When police reasonably believe that a crime might have been committed, those closely con-

nected in time and place to the criminal activity are undoubtedly proper subjects for limited police questioning, for they are most likely to have information of value to the investigation. Far different is a sweeping procedure whereby police pick up persons with past criminal backgrounds, and seek to question them in regard to a suspected crime with which they have no connection save "reputation". Such a procedure is indefensible, and I am totally opposed to such a sweeping extension of police power.

### B. Right To Stop Automobiles

Admittedly, the above examples deal with individuals on foot. But, I can see no difference in principle between the detention of an individual on the street and the stoppage of a car, so long as there is no violence or highhandedness involved in the latter procedure.[16] Certainly, it would make no difference in the example cited if the individual questioned happened to be sitting in a parked or moving car near the corpse. In fact, there might be more justification for a policeman's stopping of a car leaving the vicinity of a suspected crime, for in such a situation, if action is not immediately taken, there is not likely to be another chance.

■ Courts have recognized the right of law enforcement agents reasonably and temporarily to stop vehicles

---

a suspect, it is better for both the efficient administration of justice and for the safety of innocent individuals that police be allowed to put questions to persons who might have information on a suspected crime. These persons need not say anything to the police. But, it is often in their interests to talk. It is, therefore, accepted in England that to deny them the right to make statements which they might be anxious to make is to put too great a hardship both upon the citizens and the police. Id. at 31–62.

15. Moreover, I do not believe that it could be seriously questioned that a police officer would have the legal right to question persons in the vicinity of a suspected crime on less basis for belief that a crime had been committed than would be supplied by the bloody corpse referred to above. Let us suppose that a policeman

standing outside an apartment house heard a cry for help, or a cry that a woman was being attacked. He could undoubtedly stop and question all those who sought to leave the apartment house immediately thereafter, even though it again was perfectly possible that no one present was guilty of wrongdoing, and certain that not all of the persons stopped were guilty of the commission of a crime.

16. It should be noted that had Joseph Barbara, Sr. lived in an apartment house, instead of on an estate, it is most likely that the individuals involved would have been stopped and asked questions while on foot. It seems absurd that different rules should apply depending on differences in geography and the size and location of the property involved.

and question occupants on grounds that might not amount to a basis for arrest or search. In Brinegar v. United States, 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, the Court found it unnecessary to reach the legitimacy of stoppage for investigation, for it found in that case circumstances amounting to "probable cause". But Mr. Justice Burton said in that case:

> "It is only by alertness to proper occasions for prompt inquiries and investigations that effective prevention of crime and enforcement of law is possible. Government agents are commissioned to represent the interests of the public in the enforcement of the law and this requires affirmative action not only when there is reasonable ground for an arrest or probable cause for a search *but when there is reasonable ground for an investigation.*" 338 U.S. at page 179, 69 S.Ct. at page 1312 (concurring opinion). (Emphasis supplied.)

And in that same case Mr. Justice Jackson, though dissenting, nevertheless suggested the propriety of setting up a roadblock around the scene of a kidnapping, and stopping all cars seeking to pass through, even though it would be clear in that case that most of the cars stopped could have nothing to do with any criminal activity. See 338 U.S. at pages 182–183, 69 S.Ct. at page 1314 (dissenting opinion). Even more explicit have been the opinions of some Courts of Appeals. See, e. g. Smith v. United States, 8 Cir., 1959, 264 F.2d 469, 472; McCarthy v. United States, 8 Cir., 1959, 264 F.2d 473, 475.

 It is clear, that the mere stoppage of a car by a police officer is not

such an illegal act that would taint all evidence stemming therefrom. On the other hand, it seems equally clear that the essential freedom of the individual demands that police not be permitted to stop every car that passes with no other justification than mere inclination or the desire to harass with no legitimate end in view. In my preliminary opinion on these motions I alluded to the requisites for a legal stoppage for investigation, which I found were met in this case. I stated those requirements to be (1) belief by the officer involved that a crime might have been committed; (2) reasonable grounds for such a belief and (3) absolute necessity for immediate investigatory activity. These factors, when met, would constitute reasonable basis for stopping an automobile for the purpose of inquiry even though they might provide something less than would constitute probable cause for a formal arrest of its occupants. From the facts set forth above (pp. 5–10, supra), it is clear that the officers involved believed that a crime might be in progress, (Tr. 2112–13, 2123, 2242–44) and that they had reasonable grounds for such a belief.[17]

A shift in context may serve to illustrate these criteria more clearly. Let us assume that there is a person charged with a revolting crime lodged in a small town prison awaiting trial. Sentiment in the community is heavily against the prisoner, emotions are highly charged and lynching is feared. The local police learn in the course of their ordinary duties that persons are beginning to gather on the farm of a local resident. The police drive over to the farm, and discover that fifty or sixty persons, from all over the community, have gathered. Could it be doubted that the police would

17. It is hard to conceive of a situation wherein it can be said with honesty and absolute assurance that officers have *knowledge* or are sure that a crime has been committed. Even the most stereotyped murder scene, a bloody corpse, with a gun next to it, admits of too many explanatory hypotheses to support the viewer's "knowledge" that a crime has been committed. The death might be the result of suicide or the death might have been the result of a killing in self defense, or an accident. The most trustworthy testimony, because the most accurately descriptive of an investigating officer's state of mind, is testimony like Sgt. Croswell's, that he believed that a crime might have been committed, and that the situation demanded further investigation. See Tr. 2112–13, 2123, 2242–44.

have the right and duty to stop the persons attending this gathering after they depart and thus seek to ascertain their indentities and their purposes for being there? Such a procedure ought not be impermissible merely because there is no asolutely certain knowledge that the crime of conspiracy to commit murder has been entered into. In the illustration cited the officers would be acting within their authority for they would have reasonable grounds for believing that a crime might have been committed, to wit, conspiracy to commit murder, and circumstances were such that immediate activity on their part would be absolutely necessary.

It should also be noted that in the cited illustration there was no element of flight by the participants to strengthen the officers' belief that a crime might be in the process of commission. This element was present in the instant case. Nor was it posited that the gathering in the illustrative case took place at the home of an individual with a history of criminal activity. Thus the basis of the police belief in the case now under discussion is far stronger than in the hypothetical case. But, in both cases law enforcement officers took reasonable and fair action designed to learn about a potential evil without "raiding" private property, or interfering in any way with property rights or the sanctity of the home.

Furthermore, it is clear that immediate action on the part of the police was absolutely necessary in this case. Police activity without a warrant may be more reasonable in the case of an automobile, which if not stopped is not likely to be seen again, than in the case of a fixed abode. This has been recognized in the line of cases, dealing with the transportation of contraband, that followed Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. And the proposition was very clearly stated in Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436:

> "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. But this is not such a case. * * * No suspect was fleeing or likely to take flight. *The search was of permanent premises, not of a movable vehicle.*" 333 U.S. 14–15, 68 S.Ct. 369 (Emphasis supplied.) See also Clay v. United States, 5 Cir., 1956, 239 F.2d 196, (no need to stop vehicle because suspect's haunts well known to police).

Thus, on the basis of the facts presented here, it is clear that the procedures utilized by the police officers in and around Apalachin on November 14, 1957 did not constitute an invasion of the liberty of any individuals so as to compel the suppression of the evidence procured. There was no "raid" in this case. There was no violence in the stopping of the cars. There was no police brutality, or coercion, or even pressure of any kind. There was a reasonable act on the part of law enforcement officers whereby on a public highway and later at Vestal, they put themselves into a position to question persons about a subject of legitimate police interest, with the least possible inconvenience to the persons questioned. Indeed, in this case, we are not dealing merely with a nebulous concept like "legitimate police interest" but with a reasonable belief that a crime might have been committed which demanded immediate investigation.

**C.** *Right of Individuals to Exculpate Themselves.*

The administration of justice is not an exact science. Its subject matter encompasses very nearly the totality of human experience, and is concentrated upon that area of life least subject to mathematical precision: relationships among persons. Furthermore, the administration of justice is a personal venture; no machine has yet been designed that can do justice, and none seems likely in the near future.

When mere human beings are confronted with such a complexity of sub-

ject matter, errors must occur. In order to compensate for inevitable mistakes the persons charged with the administration of justice indulge in certain techniques developed over the years in order to assure, as adequately as possible, that the expected errors should balance the scales toward an end thought most conducive to our concept of justice.

 One of the most common, but most important, of these corrective efforts is the philosophy that justice is better served if a guilty person is allowed to go free, rather than condemning an innocent person as a criminal. Like most judicial philosophies, this one is expressed in legal rules. Thus a defendant is presumed innocent until proven guilty. He may not be compelled to be a witness against himself. A coerced confession or admission is not admissible against the defendant who gave it. An incriminating statement made by a person detained by police for an unreasonable period before arraignment may not be subsequently used against him. These are vital and necessary rules of law for they tend to assure that innocent men will not be convicted of crime and that overzealous police officers will be restrained.

But, the fact that a certain rule tends toward a desired end does not mean that an expansion of that rule will tend toward the same end. The opposite might well be the result. If the right of police to investigate a crime before formally arresting and charging a person is restricted too severely, not only will guilty persons go free, but innocent persons will suffer unnecessarily. Police officers tend, by and large, to uphold and be ruled by the law. There are overzealous policemen, just as there are bad members of other occupations and professions, but they are the exceptions in generally creditable callings. If the police are told that they may not question a person until he has been formally arrested and arraigned, they will carry out that precept to the letter, especially if to do otherwise would be likely to result in an escape from punishment by guilty men.

Instead of giving a person an opportunity to exculpate himself from any suspicion of wrongdoing, they will arrest him first and ask questions afterwards.

That is not to suggest that they will compensate for their restricted authority to question by committing another illegal act, to wit, arrest and charging without sufficient grounds. There are many occasions where a man appears guilty enough to be arrested and arraigned, when in fact he is entirely innocent of wrongdoing. This innocence may be easy to establish, once the suspect is allowed to give his story to the police. But it is easy to conceive of the police not allowing any suspect to say anything before formal arrest and arraignment if that practice were termed illegal by the courts, particularly if such conduct might result in the freedom of a person actually guilty.

This is not just an abstract proposition. Consider the case of a man suspected of a sexual assault against a minor. The child gives the name of a man living in the same building. Her story seems plausible to the police for the man had access to the child. Clearly, the police at that point would have a sufficiency of evidence to arrest the man formally and bring him before a magistrate for arraignment. Clearly also, the newspapers would have the right to state that the man had been arrested for a sexual attack. His friends, his business associates, his neighbors would be made aware of the charge by the publicity and the police activity and forever after he would have a record for having been arrested for a sexual crime.

But, it might be that the child was mistaken, and in fact the accused was at the time of the alleged attack dining with a person of unimpeachable character at a great distance from the alleged crime. Far better it would be for the accused to be given the opportunity to present his "alibi" to the investigating police and wait while they established its sufficiency. He would in that way be spared the crushing humiliation that must be

experienced by an innocent man who is arrested, "booked" and fingerprinted.

As Justice Devlin incisively puts it:

"If you are charged with committing a crime at 8:30 in the evening when in fact you were dining with the Home Secretary, you would have to exhibit an almost fanatical attachment to your constitutional rights, if you were to fold your arms, keep silent [and] languish in custody * * * " Devlin, The Criminal Prosecution in England, at p. 60.

Thus, if in an effort to protect innocent persons, we restrict too much the right of the police to investigate before a formal arrest, the circle of the unprotected will be widened. The true end must be kept in sight. There is no value in the limitation of police power merely for the sake of limitation. The true and ultimate end is to protect innocent persons from false charges. If allowing law enforcement officers to question persons as part of the investigation of a crime, will further this end, forbidding that procedure would divert us from the objective. Sweeping generalities ought not be indulged in, and the focus should be on the facts of the particular case. General propositions no more decide concrete cases in criminal law than they do in the area of economic regulation. Here the police moved with restraint after they had reasonable grounds to believe that a crime might have been committed.

## IV. The Nature of the Evidence Involved.

In order fully to comprehend the fallacy of the defendants' position, however, it is necessary to consider not only the nature of the process of investigation but to consider the nature of the evidence to which objection is now taken.

### A. No "Property" Involved.

 The jury in this case was not presented with any seized narcotics or untaxed alcohol, or indeed with any object or paper taken from any person. In every case cited by the defendants to buttress their claims under the Fourth Amendment, physical property was involved. In the instant case the evidence objected to was testimony by law enforcement agents as to observations and personal identifications made by them, and of conversations with the conspirators. It is this factor which points up, I believe, the misapprehension under which the defense labors as to the legality of this stoppage and questioning. They are apparently under the impression that the same standard must be applied when persons are merely stopped and questioned, as they were here, as when an arrest without a warrant is used to justify a seizure without a search warrant. It is clear that property may not be seized without a warrant unless the seizure is made pursuant to an arrest lawful under state law. See, e. g. United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. In such a situation the government is seeking to justify an interference with property rights. Thus, it is reasonable to demand that the officers have, at the time of the seizure, that degree of certainty, amounting to "probable cause" that would have made it possible for them to have acquired the necessary warrant had they had the opportunity.

 But it is not contended that the stoppage and questioning in this case constituted a lawful arrest that would justify a seizure without a warrant. It is contended only that the stoppage itself was not an illegal act such that even observation, hearing and identification stemming therefrom is tainted evidence. If it were held that the mere identification of a person were a violation of the Fourth Amendment, if made after that person had been stopped by a law enforcement officer, it would become impermissible for such officers ever to stop a suspect unless the officer had "probable cause" for a warrant before the stoppage.

To see the absurdity of such a holding, one need only extend the hypothetical situation suggested by Mr. Justice Jackson in the Brinegar case. Let us assume that the police set up a roadblock around

the scene of a suspected kidnapping, and in fact manage to stop a car in which the kidnappers are riding after having disposed of the victim. The kidnappers are questioned, identified and then allowed to proceed, there being no grounds for an arrest at the roadblock. Subsequently, however, new evidence is uncovered and the kidnappers are put on trial. If the defendants' position in their instant motions is to be upheld, the logical result would be that the officers who manned the roadblock could not testify to the presence of the kidnappers in the vicinity of the crime, or to anything uncovered through knowledge of the presence.[18] Nor, presumably, could they testify to any exculpatory statement made by any of the kidnappers at the roadblock.

### B. *No Seizure Involved.*

More important, if the evidence challenged by these motions is to be considered as analogous to "property", it is extremely difficult to find that it was, by any semantic stretch, "seized" property. It seems perfectly clear on the record that whatever statements were made by these persons were made voluntarily. There is considerable evidence that those persons who refused to speak were not pressed to do so. Vito Genovese, for instance, was allowed to proceed on his way even though he refused to make any statement at all. He was not even sent to the Vestal station. Tr. 785, 1282. The same is true of Barbara, Jr. Tr. 846. Cannone went home first and got his car registration (Tr. 2121) and voluntarily appeared at Vestal.

Furthermore, the statements that were made by the persons interviewed, and which were put before the jury, were all highly exculpatory. When a confession or admission is made by a person to an inquiring police officer, the inference based on considerations of common experience and psychology, is that the statement was not volunteered. But, the inference is precisely opposite when the statement made is designed to exculpate the maker thereof. In this case there is no evidence that all these statements were not volunteered by persons anxious to convince police officers that they were innocent of any wrongdoing. The defense did not choose to call any witnesses to testify in regard to the challenged police procedures, though they had the opportunity to do so out of the presence of the jury at the *in camera* hearing. It should be noted that defendant DeSimone is an attorney, and would have been particularly well qualified to testify to acts by the police that infringed on his constitutional rights as well as those of others.

On the basis of such a record it must be concluded that there was in any event no "seizure" of any of the evidence put before the jury. See United States v. Dornblut, 2 Cir., 1958, 261 F.2d 949, 951; United States v. Bianco, 2 Cir., 1938, 96 F.2d 97; United States v. Martin, D.C. S.D.N.Y.1959, 176 F.Supp. 262.

### V. The McNabb-Mallory Rationale.

The nature of the evidence now being challenged points up the insufficiency of these motions if viewed as having been made under the rationale of Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. Under that doctrine, an incriminating statement may not be used against a person if made during an unreasonably long detention before arraignment. Even assuming for the purposes of this decision that such a rationale applies even when the person is not detained preparatory to answering for a crime, i. e. when arraignment was never contemplated, it is clear that the McNabb-Mallory rationale was not violated in this case. In the Mallory case, Mr. Justice Frankfurter stated:

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay

18. See, e. g. Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 268, 84 L.Ed. 307 for the "fruit of the poisonous tree" doctrine.

between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession." 354 U.S. at page 455, 77 S.Ct. at page 1379.

And, as the Court of Appeals for this Circuit stated in a very recent opinion: " * * * during the period of investigating a crime, the police must have the power to detain suspects for reasonable periods of time in order to question them, check their stories and to run down leads which either confirm or contradict those stories." United States ex rel. Corbo v. LaVallee, 1959, 270 F.2d 513, 518.

In the light of such standards we view the facts in this case. There is uncontradicted evidence that the persons at Vestal were questioned as quickly as humanly possible in view of the small staff available for the task, and that no person was questioned more than one-half hour. The time was passed by these persons at Vestal together in one another's company and the greater part was taken up with waiting to be questioned or waiting for friends to be questioned so that groups could leave together. This was not an unreasonably long delay, and it is clear that it was not a detention that gave opportunity for the extraction of a confession.

### VI. The Henry Case.

There remains but one matter to be discussed. That is the applicability of the recent Supreme Court case of Henry v. United States, 80 S.Ct. 168. I have purposely delayed discussion of that decision until the end of this opinion because of my belief that it will be more obvious at this point, that the Henry decision is inapplicable.

In the Henry case the government conceded in the lower courts, see 7 Cir., 259 F.2d 725, and adhered to the concession before the Supreme Court, that an "arrest" occurred the moment the car in which Henry was riding was stopped by Federal agents. The Court stated in its opinion in Henry [80 S.Ct. 171]:

"The prosecution conceded below, and adheres to that concession here, that the arrest took place when the federal agents stopped the car. *That is our view on the facts of this particular case.*" (Emphasis supplied.)

When the opinion in Henry is read in light of the government's concession, it becomes evident that the Court was not deciding more than that, in the circumstances of that case, there was not probable cause to justify an "arrest" at the time the car was stopped.[19]

But it must be emphasized that the "arrest" that was conceded by the government was that species of arrest that can serve to justify a search and seizure without a warrant. For that type of "arrest", there must be a finding of probable cause at the time of the detention. But the government does not urge that in the instant case there was probable cause for an arrest for purposes of seizure when the cars were stopped at the checkpoint near the Barbara estate. The government argues here the right of law enforcement officers to stop cars and make inquiries under the specific circumstances of this case. That proposition was not argued in the Henry case, and is still an open question before the Court.

Furthermore, in the Henry case the defendants were convicted on the basis of contraband seized from their car after its stoppage. The physical evidence was obviously not voluntarily supplied to the officers. But, as has been pointed out in great detail above, the evidence challenged in this case consists of exculpatory

---

**19.** The Court noted in a footnote that:
"An alternative theory that the arrest took place at a subsequent time was discussed by the Government only to make it clear it would press that position on the facts of another case [359 U.S. 965, 79 S.Ct. 881, 3 L.Ed.2d 833] now pending here, Rios v. United States."

statements. All the evidence makes the conclusion inescapable, that these statements were not only given without coercion, but that they were volunteered by the parties, who sought to convince, and indeed were successful in convincing, the police of their innocence of any wrongdoing.

While the defense has suggested that the statements to a police officer can never be voluntary, I need but suggest that instances are overwhelming where the individual is not only willing but anxious to make a statement to a police officer. History buttresses this obvious reality. It is true that the American system, like the English system,[20] gives the individual the right to be silent,[21] but frequently the opposite course is the attractive one. Our system combines the individual's right to silence with the opportunity to speak. There are reasons why the individual avails himself of the opportunity to speak. He might do so because he believes himself innocent or because he feels sure of his ability to talk his way out of any involvement. He may feel that he has invented a convincing story and is anxious to let the authorities have it so that at its inception any investigation may be thwarted and not pursued further.

It is impossible to equate the seizure of physical, incriminating evidence with the elicitation of voluntary, exculpatory statements. And without that equation, the Henry case becomes inapplicable to a decision of the instant motions.

### VII. Conclusion.

In sum then, I am requested by these motions to rule that exculpatory statements, voluntarily given, may not be admitted in a federal court when procured after automobiles have been stopped in a reasonable manner, after police believed a crime might have been committed, and

their occupants questioned with full awareness of their constitutional rights. I do not think such a ruling is justified by reason or required by authority. Therefore, I adhere to my earlier ruling and deny the motions to suppress the evidence referred to above.

---

**20.** See note 14, supra.

**21.** It must be borne in mind that the defendants in this case had a constitutional right to remain silent when questioned by police or other investigatory agents or bodies, but they chose not to do so.

Had they chosen such a course, they would have suffered no penalty. However, they apparently chose what they believed was the better course, to give statements designed to impede and thwart the investigation at its inception and continuously thereafter.