William Rand, Jr., J.
The defendant moves to suppress evidence seized from his possession at the time of his arrest. Although there was considerable conflict in the testimony elicited at a hearing held on the motion, the following facts were established.
At about 3:15 a.m., on the morning of July 29,1962, two police officers in a patrol ear saw the defendant walking south on Havemeyer Avenue near Powell Street, in Bronx County, wearing a sport coat, “ chino ” pants and low shoes, and carrying in his hand a gun ease of a size used for a rifle or shotgun. When questioned, the defendant first said he was going to hunt ducks, but upon being told that there was no duck season in July said that he was going to hunt woodchucks. One officer then asked to see the kind of a gun the defendant was going to use, and the defendant took a shotgun out of the case. While the shotgun was still in the defendant’s hands, the officer released the catch causing the gun to open and permitting the officer to see that it was loaded. At this point the officer told the defendant he would have to come to the station house for further questioning, and before putting him in the patrol car touched the outside of the defendant’s clothing and felt a hard object the size of a pistol near the defendant’s waist. A more formal search of the defendant’s person revealed that the object was a loaded Mauser automatic pistol concealed in the defendant’s belt and that the defendant also had on his person a fountain-pen-type tear gas gun loaded with a blank cartridge and two hunting knives. The defendant was then formally arrested and subsequently booked *469 on two charges, one relating to his possession of the shotgun, the other relating to his possession of the concealed weapons. After a hearing before a Magistrate, the shotgun charge was dismissed on the ground that it had erroneously been brought under a provision of the Conservation Law which was not applicable.
The defendant now contends that the officer at no time had a right to arrest or search him and that the evidence discovered by the illegal search should be suppressed, under the exclusionary doctrine of Mapp v. Ohio (367 U. S. 643).
The suppression of evidence obtained by an unlawful search and seizure is provided for in section 813-c of the Code of Criminal Procedure, which was enacted in 1962 to provide an orderly procedure for the application of the exclusionary rule mandated by the Fourth and Fifth Amendments to the United States Constitution. The rule requires that evidence obtained by State or Federal officers in violation of such amendments be excluded from a criminal trial. Its purpose is to deter overzealous law enforcement officers from infringing upon the rights of privacy guaranteed to every citizen by the Bill of Rights. (Mapp v. Ohio, supra; Elkins v. United States, 364 U. S. 206; Weeks v. United States, 232 U. S. 383.) Despite respected opinion that it would merely permit the 1 ‘ criminal * * * to go free because the constable has blundered ” (People v. Defore, 242 N. Y. 13, 21), the rule was made applicable to State courts on the theory that there was pragmatic evidence that it would not seriously fetter law enforcement and that the history of the criminal law proves that ‘ ‘ tolerance of shortcut methods in law enforcement impairs its enduring effectiveness.” (Mapp v. Ohio, supra, p. 658.) If the exclusionary rule is to succeed in its over-all purpose of improving law enforcement, it must be applied intelligently so as to create the greatest possible deterrence to illegal police activity while at the same permitting as few criminals as possible to go free. Certainly, the object of the rule is not to free guilty persons or to deter enterprising and vigilant police officers, but if it is applied by the trial courts in a blind or technical way without the use of wise discretion, its unintended result could be to induce perjury, destroy police morale and endanger the public. “ We are not to strain an immunity to the point at which human nature rebels against honoring it in conduct ’ ’. (People v. Chiagles, 237 N. Y. 193,197.)
The first question to be decided on this motion is whether the police violated the Fourth Amendment at the time the officer ing. While such a touching might technically constitute an released the catch on the shotgun which the defendant was hold- *470 assault if not authorized by law, the protection of the Fourth Amendment does not require the exclusion of evidence because of police action which is de minimis with respect to the right of privacy and essential to the safety of the officer. “ That every temporary restriction of absolute freedom of movement is not an illegal police action demanding suppression of all resultant evidence is accepted by the federal courts, though it is a proposition incompletely articulated.” (United States v. Bonanno, 180 F. Supp. 71, 78.)
Secondly, it must be decided whether the police had the right to search the defendant at the time the officer touched the defendant’s clothing and felt the Mauser pistol. Such a right would exist if the officer then had a right to arrest the defendant, and it matters not that the search preceded the formal arrest. (Husty v. United States, 282 U. S. 694, 700.) Under the applicable New York law, the officer was authorized to arrest if a crime was being committed or attempted in his presence, regardless of the state of his personal knowledge or belief. (Code Crim. Pro., § 177, subd. 1.) Of course, the defendant’s concealed possession of the loaded pistol was such a crime, but evidence of such possession obtained by means of the contested search may not under the exclusionary rule be considered in deciding this motion. Instead, we must resolve the constitutional question as to whether a reasonable officer would have had probable cause under the circumstances to believe that he was authorized to make a search, and if it is found that he would not have had such probable cause the evidence should be suppressed as a deterrent to similar action by the police in the future.
Probable cause originally meant “ circumstances which warrant suspicion”. (Locke v. United States, 11 U. S. 339, 348.) More recently it has been defined as existing “ if the facts and circumstances known to the officer warrant a prudent man in believing that the offense had been committed ”. (Henry v. United States, 361 U. S. 98, 102.) The standard represents a compromise between, on the one hand, safeguarding citizens from rash and unreasonable interference with privacy and from unfounded charges of crime and, on the other hand, giving fair leeway for enforcing the law in the community’s protection recognizing that ambiguous situations often confront police officers and that room must be allowed for reasonable mistakes on their part. (Brinegar v. United States, 338 U. S. 160, 176.)
Even where probable cause does exist, a search warrant is required by the Fourth Amendment except under exceptional circumstances. Since, it is well established that the Fourth Amendment imposes more stringent requirements for a warrant *471 where the object of the search is a stationary home rather than a movable person or object (Carroll v. United States, 267 U. S. 132, 147, 153), the numerous eases holding searches of homes without a warrant to be unreasonable in the absence of exceptional circumstances are readily distinguishable from the instant case where a warrant was impossible. (Mapp v. Ohio, supra; MacDonald v. United States, 335 U. S. 451; Johnson v. United States, 333 U. S. 10; Go-Bart Co. v. United States, 282 U. S. 344; Agnello v. United States, 269 U. S. 20; People v. Yarmosh, 11 NY 2d 397; People v. O’Neill, 11 N Y 2d 148; People v. Loria, 10 N Y 2d 368.) Likewise the deserted street and the hour of the night are to be considered in determining probable cause. ‘ ‘ Nighttime presents problems different from those of daytime ”. (Bell v. United States, 254 F. 2d 82, 87, cert, denied 358 U. S. 885.)
It would also appear that the reasonableness of the search depends to some extent upon the seriousness of the crime suspected and the degree of public danger involved. A greater degree of probability is required where the search is aimed at a violation of gambling or obscenity laws (Mapp v. Ohio, supra [obscenity]; MacDonald v. United States, supra [gambling]; People v. Moore, 11 N Y 2d 271 [gambling]; People v. O’Neill, supra [obscenity]; see United States v. Di Re, 332 U. S. 581 [ration coupons]) and a lesser degree of probability is required where the search relates to a burglary, robbery or other crime involving a dangerous weapon. (People v. Carafas, 11 N Y 2d 891 [burglary]; People v. Lane, 10 N Y 2d 347 [murder]; People v. Wilson, 16 A D 2d 207 [robbery]; Busby v. United States, 296 F. 2d 328, cert, denied 369 U. S. 876 [weapons]; Robinson v. United States, 283 F. 2d 508 [burglary]; Bell v. United States, supra [burglary]; see United States v. Bonanno, supra [conspiracy] .) This distinction has been specifically made by Justice Jacksok on at least two occasions, (Brinegar v. United States, supra, p. 183; MacDonald v. United States, supra, p. 460.) Besides the serious nature of the crime suspected, it would seem relevant that the instant search occurred in a city with a rapidly rising crime rate, where during the first nine months of 1962 there occurred 375 murders and nonnegligent manslaughters, 712 forcible rapes, and 30,887 burglaries. (Federal Bureau of Investigation Reports.)
Applying the above constitutional principles to the circumstances in this case, I find that the officer had probable cause to search the defendant prior to the time he told the defendant he would have to come to the precinct and felt the defendant’s clothing and discovered the pistol. The officer already knew *472 that the defendant was carrying a loaded shotgun on a deserted city street at 3 o’clock in the morning and that the defendant had given suspicious answers when asked what he was doing with it. The loaded shotgun clearly constituted a dangerous weapon and to fire it within the city limits would be a misdemeanor. (Administrative Code of the City of New York, § 436-5.0, subd. c.) The time of night, the way in which the defendant was dressed, and the suspicious answers he made all suggested an intent on his part to use the shotgun unlawfully against another, which when coupled with possession constitutes a misdemeanor. (Penal Law, § 1897, subd. 1.) It is not entirely clear that such intent might not have been legally presumed merely from the fact that he was carrying the gun. (Penal Law, § 1898; People v. Panitz, 251 App. Div. 276; concurring opinion in People v. Ray, 28 Misc 2d 116,119; see People v. Adamkiewicz, 298 N. Y. 176,181; but, see, People v. Adamkiewicz, supra, p. 179; People v. Raso, 9 Misc 2d 739; People v. Charles, 9 Misc 2d 181.)
Moreover, the defendant stated that he was about to use the gun to hunt animals, and hunting with a dangerous weapon within the limits of a city also constitutes a misdemeanor (Penal Law, § 1897, subd. 6-b.) Thus, at the time the officer touched the defendant’s clothing he had probable cause to believe the defendant was committing a misdemeanor in his presence and was therefore authorized to arrest the defendant or to search his person incidental to such an arrest. (Draper v. United States, 358 U. S. 307.) Since under the law a search is good or bad when it starts and does not change character from its success or failure (United States v. Di Re, supra, p. 595), the validity of the search was not affected by the fact that the charge relating to the unlawful possession of the shotgun was subsequently erroneously filed, under the Conservation Law. (People v. Wilson, 16 A D 2d 207, 210, supra.)
Even if the officer had not had probable cause to believe a crime was being committed in his presence sufficient to justify an arrest, I believe he had a right under the common law to take certain minimum action to investigate the defendant’s intended use of the shotgun. It is true that numerous opinions discuss police search and detention in terms of being exclusively either an unlawful trespass or a lawful search or arrest. (Henry v. United States, 361 U. S. 98,103; Agnello v. United States, 269 U. S. 20; People v. Loria, 10 N Y 2d 368, 373, supra; Collins v. United States, 289 F. 2d 129.) On the other hand, there is also substantial authority for the right of police under certain circumstances to take investigatory action not amounting to either a search or an arrest. (Rios v. United States, 364 U. S. 253, *473 262; Brinegar v. United States, 338 U. S. 160, concurring opinion, p. 179, and dissent, p. 183, supra; Busby v. United States, 296 F. 2d 328, 331, supra; United States v. Bonanno, 180 F. Supp, 71, 78, supra; People v. Houghtaling, 16 Misc 2d 459; People v. Witt, 159 Cal. App. 2d 492, 496; People v. Martin, 46 Cal. 2d 106, 108; Gisske v. Sanders, 9 Cal. App. 13, 16.) There are also other cases where a search was found to be reasonable although it would appear that the defendant’s freedom of movement had been interfered with before the officers had enough information to justify an arrest. (Brinegar v. United States, supra; Husty v. United States, 282 U. S. 694, supra; Carroll v. United States, 267 U. S. 132, supra; Robinson v. United States, 283 F. 2d 508, supra; McCarthy v. United States, 264 F. 2d 473; Bell v. United States, 254 F. 2d 82, supra; People v. Carafas, 11 N Y 2d 891, supra.)
Extreme examples of circumstances in which police must be permitted some powers of investigation come readily to mind. Suppose an officer finds a man standing alone next to a bloody corpse, or suppose a child has been kidnapped in an area that can be readily isolated by road blocks. Recognizing the need for police detention powers in such circumstances, several jurisdictions have adopted the uniform arrest act which specifically provides that police may detain persons prior to arrest for limited periods of time where the circumstances warrant a reasonable suspicion that the person is or has been committing a crime. (Delaware Code, tit. 11, §§ 1901-1932; New Hampshire Rev. Stat. Ann., § 594:2; Rhode Island Gen. Laws, tit. 12, ch. 7; see, also, N. Y. General Business Law, § 218.)
As a practical matter it is well known to be common police practice in all jurisdictions to exercise limited powers of detention, frisk and interrogation. (Police Detention and Arrest Privileges by O. W. Wilson, 51 J. of Crim. Law, p. 395, 399 [Nov.-Dec., 1960]; see The Law of Arrest by E. W. Machen, Jr. [1950], pp. 3-6.) Such powers, particularly, with respect to “nightwalkers ”, can be traced back for many years. (History of the Pleas of the Crown by Hale [1847], vol. 2, p. 96; Lawrence v. Hedger [1810], 3 Taun. 14, 128 Eng. Rep. 6; Rex v. Bootie [1759], 2 Burr. 864, 97 Eng. Rep. 605.)
Under the circumstances of the instant case, the police cannot be criticized for not having followed the defendant until they obtained more positive proof of his guilt. The officers were in uniform in a painted patrol car. Having once stopped the defendant, they could not then decide to follow him. Their choice was to investigate immediately or give up all surveyance and risk the commission of a serious crime. Having chosen *474 reasonably, they were authorized to ‘ ‘ frisk ” for hidden weapons which might endanger their lives. (See People v. Chiagles, 237 N. Y. 193,197, supra.) Under the circumstances, the “ frisking ” of the defendant represented no more than a proper balance between the constitutional rights of the officers and the public to their lives and the constitutional right of the defendant to his privacy. It, therefore, did not constitute an unreasonable search within the meaning of the Fourth Amendment and no constitutional purpose would be served by suppressing the evidence which was thereby obtained.
Motion denied.