Feed A. Yomra, J.
On April 13, 1955, Peter Hook, an assistant cook employed at Utica State Hospital, called the hospital and reported that he was ill and would not be able to report for work. At approximately 4:00 p.m. the samé day, Hook’s wife telephoned his superior, Keith A. Wheeler, food service manager at Utica State Hospital, and informed Mr. Wheeler that Hook was not ill but had taken the day off to dispose of certain property he had stolen from the hospital. At the time she mentioned butter, sugar, coffee and canned fruit as the articles purloined. Wheeler immediately reported Mrs. Hook’s telephone call to his superior, Lawrence J. Maxwell, business officer of the hospital. Maxwell in turn reported the call to Dr. Bascom *674 B. Young, the director of the hospital. Maxwell informed Dr. Young that it was his thought if Hook was disposing of the articles, he should investigate, whereupon Dr. Young directed Maxwell to proceed and do what he thought was right.
Thereupon, Maxwell, accompanied by Wheeler, set out to visit the Hook household at Stittville, New York. However, neither of the parties knew exactly where Hook lived. After some time elapsed, they stopped at the Marcy Tavern in Marcy, New York, to call their wives in order to explain their delay in returning home. At that point, the hospital investigators met Trooper Leo Bartkowiak of the New York State Police and solicited his assistance. The trooper knew Hook and took both Maxwell and Wheeler to the Hook residence where they met Mrs. Hook, who admitted making the call and informed the group that Hook was disposing of the property by dumping it into Nine Mile Creek. However, she said there was a motor on a pump in the cellar which had come from the State hospital. She invited the party into her house to look around. Maxwell went into the cellar with the trooper and took the serial number of the motor. At the time, Mrs. Hook said she was having marital troubles with her husband and expressed a fear that her husband would do her bodily harm. She also mentioned canned goods, coffee and other items that Hook had allegedly taken.
Finding nothing other than the motor, the two hospital employees and the trooper left and shortly thereafter, at approximately seven o’clock, encountered Hook upon the road in his automobile. The trooper stopped him, then informed him why he was stopped and asked him if he would mind the trooper checking his car trunk. Hook agreed to the checking of his trunk, but nothing was found. Trooper Bartkowiak contacted the State Police B. C. I. for assistance and asked Hook if he would consent to get into the State car and talk to the B. C. I. men. Hook agreed and the party took off to a rendezvous point in back of Marcy State Hospital where they met Corporal Cerino and Trooper Farron of the State Police B. C. I. At this point Hook was questioned by Cerino about the property and refused to tell anything about it.
Meanwhile, an unsuccessful attempt was made to check the motor’s serial number by telephoning Utica State Hospital. Cerino asked Hook if he would go with Trooper Bartkowiak to the home of Justice of the Peace Link and Hook agreed. Thereupon, the B. C. I. men and the two State hospital employees went back to the Hook home where Mrs. Hook insisted that they go through the building again. She told them if they could not find any State property, she would prefer charges for assault *675 and failure to keep the peace. Nothing was found this time but the motor and an empty peach can bearing the label of a brand used at the hospital which could have>,been purchased in many stores. An old paint brush with1 ‘ State of New York ” stamped on it was also found in a back hall to which other persons had access.
Before the investigating party left the Hook homestead, Corporal Cerino asked Mrs. Hook if she would prefer charges against her husband for assault or failure to keep the peace, but she refused at this time, again expressing fear of her husband.
In the meantime, Hook and Trooper Bartkowiak had proceeded to Judge Link’s. Hook asked to use the phone and when given permission to do so, he called his wife, said “ Thanks a lot baby ” and hung up. He then made a phone call to William Ribyat, an attorney in Utica, and told Ribyat that he was under arrest. The trooper and the Judge both spoke to Ribyat. The trooper told Ribyat that Hook was not under arrest and that there was no warrant issued. Ribyat asked Link if Hook was arrested and Link informed the attorney that he didn’t know if Hook was under arrest, but he knew no warrant had been issued. There is some conflict with respect to this latter telephone call.
The two B. C. I. men together with Maxwell and Wheeler arrived about a half hour later and showed the Justice of the Peace the paint brush. They mentioned the motor, but admitted that they did not know if it was a State motor or not. The Judge refused to issue a warrant, and at approximately 10:00 p.m. Trooper Bartkowiak returned Hook to his car and left him.
Subsequently, the troopers looked in several places for the stolen material and interviewed several farmers in the vicinity named by Mrs. Hook as having been receivers of the property. Parts of Nine Mile Creek were also investigated by the hospital employees. However, nothing was turned up nor was any motor reported missing from the hospital.
The next day upon reporting to work, Hook was instructed to see Wheeler who in turn took him to Maxwell. He was then taken to Dr. Young’s office where certain conversations were held with Dr. Young and a record thereof transcribed. This record was received in evidence as claimant’s Exhibit 6. Thereafter, Dr. Young directed Hook to report back to duty in the kitchen. No formal charges were subsequently preferred against him and at the time of the trial he was working as an assistant cook at the hospital, nor were any criminal charges preferred, against Hook for stealing State property from the hospital up to the time of the trial.
*676 On July 8,1955 Hook filed a claim with the Clerk of the Court of Claims and served a copy thereof upon the Attorney-General. The claim alleged that he was illegally arrested on April 13,1955, by a State Trooper, together with Maxwell and "Wheeler, and detained several hours.
The claimant has failed to establish by a fair preponderance of the credible evidence facts sufficient to constitute a cause of action for false arrest and imprisonment. Concededly, no warrant, based upon a larceny of articles from Utica State Hospital, was ever issued for the arrest of Peter Hook on or before April 13,1955. No crime was committed in the presence of any of the three troopers and two hospital employees nor is there sufficient proof in the record to establish that in fact Peter Hook had committed a felony or that in fact a felony had been committed. (Code Grim. Pro., § 177.)
Hook testified that he was arrested by Trooper Bartkowiak. On the other hand, Trooper Bartkowiak testified that he did not arrest Hook, but that Hook had consented to accompany him and go along in the State car to talk to the B. C. I. Corporal Cerino testified that he asked Hook if he would go along with Trooper Bartkowiak to Justice Link’s office and Hook consented. William D. Ribyat, Jr., the attorney Hook called from Judge Link’s, tended to corroborate Hook with respect to the arrest. However, the source of Ribyat’s knowledge was the telephone call. Furthermore, he testified from a rather questionable recollection bolstered by some scratchy notes he had made. As we indicated upon the trial, after three days of observing Peter Hook, we place little credence in what he says. On the other hand, the three troopers were witnesses worthy of belief. They were experienced policemen aware of the fact they did not have a warrant for the arrest of Peter Hook or sufficient grounds to arrest him without one. At the time of the alleged arrest, they were merely investigating an alleged theft. So that upon this basis we make the finding that Peter Hook was not arrested by any State agent on April 13, 1955, but had accompanied the State agents voluntarily. On the other hand, even if we were to believe Peter Hook and hold that he was in fact arrested by the State Police at the time in question, it is our opinion that he sustained nothing more than nominal damages. As indicated supra, there was not sufficient evidence produced upon the trial to prove Peter Hook was guilty of larceny. However, the record indicates that the claimant and his wife had considerable marital difficulties. These difficulties at times erupted into open warfare between the parties. This marital strife was characterized by charges and counter-charges, as well *677 as by assaults perpetrated by the parties upon each other, usually followed by recourse to the police and the courts. The occurrences of April 13, 1955, are due in part to the internal strife between Hook and his wife. The telephone call made by Mrs. Hook to Mr. Wheeler upon the date in question and the subsequent investigations of Peter Hook’s activities by the State agents was due to the vendetta being waged between Mrs. Hook and her husband rather than any lofty desire on her part to see justice done or a criminal apprehended. Mrs. Hook’s sole object was to make the State’s agents her instruments in harassment of her husband. On the other hand, the story unfolded upon the trial reflects little to Peter Hook’s credit and the entire procedure was punctuated with overtones of the marital problems in the Hook menage.
As stated during the trial, the court believes the testimony of Mrs. Hook in relation to the property being taken from the State hospital. The remarks of the court in this respect are part of the record. Neither party evinced any inhibitions when they harassed each other in public, nor were they strangers to the Justices’ Court. We doubt that the trooper’s questions and the trip to Judge Linn’s outraged Hook’s sensibilities or caused him any great degree of humiliation or mental anguish. His sole reaction was anger directed toward his wife. Hence, we conclude that even if it could be said that Peter Hook whs illegally arrested and detained, his damages would be nominal.
The claim also alleged that Wheeler and Maxwell “ unlawfully and maliciously and intending to injure the claimant thereby and cause him to be suspended from the staff of said Utica State Hospital made written and oral statements to the Director of the Utica State Hospital and other servants, agents and employees of the said Utica State Hospital to the effect that the claimant had stolen property of the State of New York from the Utica State Hospital.”
The claimant has failed to establish facts sufficient to constitute a cause of action for libel and slander. The reports made by Wheeler and Maxwell to the director of the hospital and upon which the cause of action for libel and slander is based, were fairly made and in good faith, in the belief they were true and furthermore, they were made pursuant to Maxwell’s and Wheeler’s duty as employees of the hospital. The reports were made to the director of the hospital who had an interest in the communications. All parties involved had corresponding duties ivith respect to everything that concerned the welfare of the institution, and hence, the reports were confidential and priviledged, until the claimant removed the privilege by proof of *678 actual or express malice on the part of Wheeler and Maxwell (Hemmens v. Nelson, 138 N. Y. 517, 523; Ashcroft v. Hammond, 197 N. Y. 488, 494). We find no proof of any malice, actual or express (Loewinthan v. Le Vine, 270 App. Div. 512 ,519). A signed statement made by one Louis Ricci and procured from him by the troopers in the course of their investigation was introduced in evidence as Exhibit 10. The claimant’s attorney relied upon this document as part of his cause of action for libel and slander. This document was not pleaded in the claim as a basis of the libel action nor was any motion made to conform pleading to proof. Hence, it should not be considered herein. However, since the State made no objection to its admission in evidence, we will consider the merits of the claimant’s contention for what they are worth. The document was made in good faith by the police in the prosecution of an inquiry into a suspected crime. Hence, the matter is privileged in the absence of any malice (Morton v. Knipe, 128 App. Div. 94) and we find no evidence of any malice herein. The claimant has no cause of action based on Exhibit 10.
The claim also contains an allegation that ‘ ‘ the claimant was questioned by the Director of Utica State Hospital under oath and without notice or without any charges having been stated against him in violation of the provisions of Section 22 of the Civil Service Law. ’ ’ The claimant has failed to make out a cause of action in this court based upon the aforesaid allegation. Section 22 of the Civil Service Law limits the power of removal. Up to the time of the trial, the claimant had not been removed from his position at the hospital. The said section of the Civil Service Law provides that any person whose rights are prejudiced contrary to the provisions of the section shall be entitled to an order pursuant to article 78 of the Civil Practice Act to remedy the wrong. Under the circumstances herein, jurisdiction of such proceedings would lie in the Supreme Court, Fifth Judicial District (Civ. Prac. Act, § 1287).
Finally, we must consider the allegation that the State Trooper, the B. C. I. agents and Mr. Wheeler searched the claimant’s home without benefit of a warrant. Although during the trial of this claim the causes of action discussed above were more or less the only issues pressed, nevertheless, the pleadings do mention a search without a warrant. We, therefore, find it necessary to dispose of this allegation of the claim.
It is true that no warrant was ever issued for the search of Peter Hook’s house, although a warrant could properly be issued (People v. Chiagles, 237 N. Y. 193, 196) nor was an arrest made on April 13, 1955. In view of the explicit language of rights, with the result that the inspectors of election have not *679 section 8 of the Civil Rights Law, a search of a man’s home without a warrant, except at the time of making a lawful arrest, is unlawful (People v. Defore, 242 N. Y. 13, 18; People v. Richter, 265 App. Div. 767; People v. Jakira, 118 Misc. 303). Unlawful searches are unreasonable within the meaning of section 8 of the Civil Rights Law (People v. Hill, 131 Misc. 521). We are concerned only with that section of the Civil Rights Law since the Fourth Amendment to the Federal Constitution has no application to State process (Ohio ex rel. Lloyd v. Dollison, 194 U. S. 445; People v. McDonald, 177 App. Div. 806).
The question of the implied authority of a wife to consent to the search of a house occupied by her and her husband is apparently one of first impression in this State for we find no reported New York case upon the subject. There is some conflict of authority in other jurisdictions. (See 31 A. L. R. 2d 1078, 1091 and the cases cited therein.) However, under the circumstances in the present case, where the officers searching for stolen property were informed that the suspect was attempting to dispose of it and where they were invited to search the house by the wife who was in charge in her husband’s absence, we cannot say that {he search was unreasonable and we find that her consent and invitation to the troopers was a waiver of the requirement that a warrant be procured (United States v. Sergio, 21 F. Supp. 553; United States v. Best, 76 F. Supp. 857; Cass v. State, 124 Tex. Cr. Rep. 208; Smith v. McDuffee, 72 Ore. 276; Ellis v. State, 130 Tex. Cr. Rep. 220).
The claim of the claimant herein must be and hereby is dismissed upon the merits.
The foregoing constitutes our written and signed decision herein pursuant to section 440 of the Civil Practice Act.
Let judgment be entered accordingly.