UNITED STATES of America,
Appellee,

v.

Philip VITA and Jerald Carmel,
Appellants.

No. 277, Docket 26546.

United States Court of Appeals
Second Circuit.

Argued March 10, 1961.

Decided Aug. 28, 1961.

District of New York, Brooklyn, N. Y., on the brief), for appellee.

Daniel H. Greenberg, New York City (Anthony F. Marra, New York City, on the brief), for appellant Philip Vita.

Solon B. Hanft, Brooklyn, for appellant Jerald Carmel.

Before LUMBARD, Chief Judge, MAGRUDER * and WATERMAN, Circuit Judges.

LUMBARD, Chief Judge.

Philip Vita and Jerald Carmel appeal from judgments of conviction entered in the Eastern District of New York after the defendants were found guilty by a jury on all three counts of an indictment which charged them with (1) robbing a national bank, (2) putting in jeopardy the lives of persons by the use of a dangerous weapon while committing the robbery, and (3) conspiring to commit the robbery. 18 U.S.C. §§ 2113, 371. The district judge sentenced both appellants to 15 years' imprisonment on Count Two and 5 years' imprisonment on Count Three, the sentences to be served concurrently. No sentence was imposed on Count One, which was held to be merged with Count Two.

The robbery was committed at 9:20 a. m. on September 18, 1958, when two men entered the East Gate Plaza Branch Office of the Franklin National Bank, Levittown, in the Eastern District of New York, and robbed it of $11,281 at gunpoint, firing one shot during their brief visit. The appellant Vita does not challenge the sufficiency of the evidence to establish that he was one of the robbers; Raymond Pierson, a co-defendant who pleaded guilty, testified at the trial that he was the other. Pierson also testified that the appellant Carmel waited outside the bank in the stolen getaway car, and that after Vita and Pierson left the bank they were driven from the scene by Carmel. Pierson also testified in detail with respect to Carmel's part in plan-

James M. Catterson, Jr., Asst. U. S. Atty., New York City (Cornelius W. Wickersham, Jr., U. S. Atty., Eastern

* Sitting by designation.

**526**

ning the robbery and making preparations for it. Pierson's testimony was corroborated by Jane Oakley, Vita's woman friend, who related on the stand what had happened on the afternoon and evening of the day of the robbery and told of Carmel's admission that he had participated in the crime.

## I. Carmel

 The evidence of Carmel's guilt was surely adequate to permit the jury to conclude that he was guilty beyond a reasonable doubt. Testimony given by an accomplice need not be corroborated to support a conviction, e. g., United States v. Moran, 2 Cir., 1945, 151 F.2d 661, 167 A.L.R. 403; cf. United States v. Stromberg, 2 Cir., 268 F.2d 256, 272, certiorari denied 1959, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102. In this case, the district judge charged the jury that "the testimony of an accomplice * * * should be taken with great caution and should be scrutinized very carefully by you." This afforded more than adequate safeguards to insure close examination of Pierson's story by the jury.

Carmel also contends that two statements made by Pierson in the course of his testimony so unfairly prejudiced the jury against Carmel that a mistrial should have been granted. During his direct examination Pierson was asked about a meeting he had with Vita, Carmel and a friend of theirs some time after the robbery:

"Q. Do you recall what Phil Vita said at that time, if anything? A. Yes sir.

"Q. What did he say? A. He discussed his trip from New York to Miami.

"Mr. Aldino [Attorney for Carmel]: No, your Honor, he is not telling us the conversation.

"The Court: Yes, yes.

"Just tell us, as far as you can remember, in substance, what he said to you, what you said—

"The Witness: Yes, sir.

"Phil said that we had a rough ride coming down, had trouble with

the car. He said that Jerry did some of the driving, Jerry Carmel, and that the car was being repaired, that they didn't have the car with them at the time, also the fact that was brought out—

"Mr. Tonkonogy [Attorney for Vita]: If your Honor pleases, not the fact which was brought out, who said what, if he recalls.

"A. Jerry Carmel said that he had a deal of bringing narcotics in from Havana, from Cuba."

 Carmel's counsel immediately moved for a mistrial, and the court instructed the jury to disregard the statement completely and ordered that it be stricken "as irrelevant and incompetent." Under the circumstances, the defendants were entitled to nothing more. The allegedly prejudicial remark had been drawn from the witness after counsel for both defendants interrupted his testimony and asked that he be more specific with regard to what was said. It appears from the record that it was in response to the demand that he reconstruct the conversation and tell "who said what" that the witness uttered the damaging statement. The instruction to the jury to disregard the remark was clear and unequivocal. In the absence of any showing that the prosecutor anticipated or induced the prejudicial statement, the warning to the jury cured the error. United States v. Stromberg, supra, 268 F.2d at page 269; United States v. Giallo, 2 Cir., 1953, 206 F.2d 207, affirmed 1954, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421.

On cross-examination Vita's counsel sought to impeach Pierson's credibility by uncovering his criminal record:

"Q. And of what crime were you convicted? A. What crime?

"Q. Yes. A. Taking funds from a bank.

"Q. What do you mean by 'taking funds from a bank?' A. Robbery.

"Q. Armed robbery? A. No, sir, it wasn't armed robbery.

"Q. What kind of a robbery? A. Jerry and I had toy pistols."

■ This last remark of Pierson's clearly referred to Carmel—who had been identified by various witnesses as "Jerry"—and implicated Carmel in another bank robbery than the one for which he was standing trial. Carmel's counsel again moved for a mistrial and the motion was denied with a direction to the jury that the statement be disregarded as having "nothing at all to do with this case." Since the prejudicial statement had been elicited on cross-examination at the instance of Vita's counsel and the judge's instruction to the jury was adequate, the fleeting reference to Carmel's participation in another bank robbery does not warrant a new trial. See United States v. Curzio, 3 Cir., 1950, 179 F.2d 380. The admissible evidence of Carmel's guilt was substantial, and it is unlikely that Pierson's mention of Carmel's other activities played any role in the jury's return of a guilty verdict. United States v. Tramaglino, 2 Cir., 197 F.2d 928, certiorari denied 1952, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670.

Another contention raised by Carmel on this appeal is that he was prejudiced by reason of two articles that appeared in Long Island newspapers on the second day of the trial. One of the articles was published in "Newsday" and contained information concerning Carmel's conviction for bank robbery in Miami, Florida. The other account was in the "Long Island Daily Press" and made no reference to any convictions. It was limited to a description of the charges made against the defendants and it reported that the police expected Pierson, "a third man * * * [who] pleaded guilty to driving the getaway car," to testify for the prosecution.

When the articles were called to the court's attention by Carmel's counsel, the judge asked the members of the jury whether they had read the articles in either of the two newspapers. Two jurors replied that they had. One had read only the article appearing in "Newsday" and the other had read only the account published in the "Long Island Daily Press." Both denied that they had communicated with any other jurors with regard to the contents of the newspaper accounts, and both affirmed that they could judge the case fairly despite having read the newspaper stories. The judge then held that the article appearing in the "Long Island Daily Press" was "innocuous" and could not have influenced the juror who had read it. He excused the juror who had read the article in "Newsday," however, and substituted an alternate.

■ In light of Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, the substitution of an alternate juror was necessary since the "Newsday" account contained prejudicial information. But we agree with the district judge that the story in the "Long Island Daily Press" could not have prejudiced the defendant since it contained no inadmissible or improper matter. The trial judge asked the jury collectively whether anyone else had read the newspaper accounts. No one had. This procedure adequately protected the rights of the defendant. See United States v. LaBarbara, 2 Cir., 1960, 273 F.2d 547.

Carmel also attacks the judge's charge to the jury alleging that his summary of the evidence was weighted in favor of the prosecution. This claim is entirely devoid of substance. We have read the charge and find it to be an accurate and fair account of the testimony given at the trial. The evidence incriminating the defendants was considerable and there was little offered in their defense. The trial judge is surely not required to allocate equal time in his summary of the evidence; he is necessarily governed by what has happened at the trial. The trial was conducted most fairly with all the safeguards to which the defendants were entitled.

## II. Vita

The appellant Vita assigns one principal ground for reversal: He contends that certain damaging admissions made

by him on December 21, 1959 were uttered at a time when he was being held in custody by the Federal Bureau of Investigation during an "unnecessary delay" in bringing him before a Commissioner. Federal Rule of Criminal Procedure 5(a) 18 U.S.C. Since the admissions were introduced into evidence over objections made by Vita's counsel, Vita maintains that he is entitled to a new trial under the principle set forth in Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, and McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. We hold that on the facts of this case, the McNabb-Mallory doctrine is inapplicable. Accordingly, we affirm Vita's conviction.

The facts concerning Vita's arrest were brought out at a hearing held before the district judge out of the presence of the jury after Vita's motion for exclusion of the damaging admissions. Vita testified at the hearing, as he did before the jury, and his story differed in some respects from the testimony of the F.B.I. agents. The trial judge made no detailed findings of fact, but he announced his decision at the conclusion of the hearing, saying to Vita's counsel:

"On your motion for exclusion, the Court, after due deliberation of the testimony, has reached this conclusion:

"First, I find that there has been no detention and consequently there has been no illegal detention.

"Secondly, I find that in giving this confession the defendant Philip Vita was not coerced either physically, mentally or in any other way; moreover, that before giving it he was advised fully of his rights." (Trial Transcript, p. 1202.)

■ This decision amounted to a resolution of some of the disputed issues of fact against the appellant. The credibility of witnesses on a motion to exclude or suppress evidence is for the district judge to determine, Channel v. United States, 9 Cir., 1960, 285 F.2d 217, 220; In re Fried, 2 Cir., 161 F.2d 453, 457, 1 A.L.R.2d 996, certiorari dismissed 1947, 332 U.S. 807, 68 S.Ct. 105, 92 L.Ed. 384, and the testimony of the agents supported the judge's conclusion that Vita was not detained and that he was advised of his rights.

Shortly before 10:00 a. m. on Monday, December 21, 1959, approximately 15 months after the robbery had been committed, Vita and a female companion, Mary Burns, emerged from a hotel at Broadway and 31st Street, New York City. Waiting for Vita at the entrance to the hotel and in a car parked on 31st Street were three F.B.I. Agents—Daniel Long, Joseph Flaherty, and Edward Putz. Long and Flaherty approached Vita, identified themselves, and then asked Vita and Miss Burns to accompany them to F.B.I. headquarters to answer some questions. Vita and Miss Burns agreed, and they were driven to the F.B.I. office at 69th Street and Third Avenue.

The appellant did not testify that the agents told him he was under arrest, but only that one of them responded to his protest by saying "You have to come along with us now." He testified that the agents used the same language with respect to Miss Burns, and there was certainly no reason for him to believe that she was being arrested. The agents testified that Vita was not taken to headquarters against his will, and Miss Burns' testimony supported such a conclusion.

Moreover, we find ample support for the trial judge's finding that Vita was not under detention during his questioning between the time of his arrival at F.B.I. headquarters at about 10:25 a. m. and his formal arrest at 6:52 p. m., following his confession. The agents testified that at 10:30 a. m. Vita was told that he was not under arrest, that he was free to leave at any time, that anything he said could be used against him, and that he had the right to counsel. For the next two and one-half hours Vita was continuously questioned about the bank rob-

bery by Agent Long, assisted by the two other agents; Miss Burns was interrogated separately and ultimately left at about 4:00 p. m. According to Agent Putz's log, Vita was given coffee at 10:40 a. m. and again at 12:32 p. m., when he refused an offer of food. Shortly after 1:00 p. m., Agent Long departed and Agents Flaherty and Putz continued the questioning. Meanwhile, various leads suggested by the questioning were being followed. At 3:43 p. m., Vita left the room for the first time, when he was accompanied to the lavatory; F.B.I. regulations forbid any visitor to be unaccompanied in the building. At 4:10 p. m. "case impressions" of Vita's fingerprints were taken—a process which requires the cooperation of the person being fingerprinted. At 4:32 p. m. Agent Putz's log reported that Vita consented to appear in a line-up at which he was identified by three of the bank's employees. At 4:43 he was given coffee and cigarettes, and again refused food, and between 4:51 and 6:05 he underwent a lie-detector test to which he had earlier given his written consent. At 6:12 a supplementary line-up was held before a fourth employee of the bank who had not been on hand earlier because he had lost his way.

After the second line-up, Vita returned to the interview room where questioning by Agent John Bjorklund resulted in a confession at about 6:30 p. m. Vita was formally arrested at 6:52, and the confession was transcribed and signed by about 8:00 p. m. At 8:05 he was given coffee at his request, and at 9:03 p. m. he was taken to the Federal House of Detention. The Office of the United States Commissioner had been closed since 5:00 p. m., and Vita was taken before a Commissioner the following morning, December 22.[1] Vita testified that attempts to leave the interview room during the questioning on December 21 were thwarted, but this was contradicted by testimony of the agents that he never expressed any desire to leave. We find no reason not to accept the trial judge's conclusion that Vita's presence prior to his arrest was not coerced.

Vita was apparently confident of his ability to talk himself clear of whatever suspicions the F.B.I. had of his possible complicity. Surprising as it may seem, the guilty are often as eager as the innocent to explain what they can to law enforcement officials. The very same naive optimism which spurs the criminal on to commit his illegal act in the belief that it will not be detected often leads him to feel that in a face-to-face encounter with the authorities he will be able to beguile them into exculpating him. Having chosen to talk with the F.B.I. agents, Vita cannot now be heard to complain because his calculated risk worked to his disadvantage. Dunn v. United States, 5 Cir., 273 F.2d 470, 473, certiorari denied 1960, 363 U.S. 848, 80 S.Ct. 1625, 4 L.Ed.2d 1731.

Moreover, even if Vita had been involuntarily detained for questioning or had believed that he had no choice but to accompany the F.B.I. agents to headquarters, we would not necessarily hold such detention to be an "arrest" within the meaning of Federal Rule of Criminal Procedure 5(a). The rule does not apply to a case in which federal officers detain a suspect for a short and reasonable

---

1. It is clear that this delay after arrest in bringing Vita before the commissioner was not improper under the Mallory rule. It is not incumbent upon the district court to place a commissioner on duty around the clock. Williams v. United States, 9 Cir., 1959, 273 F.2d 781, 798, certiorari denied 1960, 362 U.S. 951, 80 S.Ct. 862, 4 L.Ed.2d 868; Porter v. United States, 1958, 103 U.S.App.D.C. 385, 258 F.2d 685, 692, certiorari denied, 1959, 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed.2d 1257; see United States v. Bando, 2 Cir., 244 F.2d 833, 846, certiorari denied 1957, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53.

Vita was arrested in Manhattan but was brought before the United States Commissioner for the Eastern District of New York in Brooklyn. For all that appears he may have consented to be taken to the Eastern District; at any rate, appellant makes no complaint regarding the fact that he was not first arraigned in the district where he was arrested.

period in order to question him. The right to question has its roots in early English practice and was approved by the common law commentators and the courts. See 2 Hawkins, Pleas of the Crown 122, 129 (6th ed. 1777); 2 Hale, Pleas of the Crown 89, 96-97 (Amer. ed. 1847); Lawrence v. Hedger, 3 Taunt. 14, 128 Eng.Rep. 6 (C.P. 1810); cf. Rex v. Bootie, 2 Burr. 864, 97 Eng.Rep. 605 (K.B. 1759). In several states the authority of police officers to detain suspects for a reasonable time for questioning is granted by statute. E. g., General Laws of R. I. § 12-7-1 (1956); N. H. Revised Laws ch. 423, § 21 (1942); 11 Del.Code Ann. § 1902 (1953); see Warner, The Uniform Arrest Act, 28 Va.L. Rev. 315, 317-24 (1942). In others, the right is recognized by court decisions. E. g., State v. Hatfield, 1932, 112 W.Va. 424, 164 S.E. 518; City of Portland v. Goodwin, 1949, 187 Or. 409, 210 P.2d 577. This prerogative of police officers to detain persons for questioning is not only necessary in order to enable the authorities to apprehend, arrest, and charge those who are implicated; it also protects those who are readily able to exculpate themselves from being arrested and having formal charges made against them before their explanations are considered. See United States v. Bonanno, D.C.S.D.N.Y.1960, 180 F.Supp. 71, 81–83. The line between detention and arrest is admittedly a thin one, see Foote, Safeguards in the Law of Arrest, 52 Nw.U.L.Rev. 16, 37–38 (1957), and authorities there cited, but it is necessary if there is to be any effective enforcement of the criminal law.[2]

We do not construe the omission from the Federal Rules of Criminal Procedure of any reference to a period in which a suspect may be detained for questioning to mean that such detention is prohibited. If we were to construe Rule 5(a) to require of federal officers that they formally arrest and bring before a committing magistrate all those whom they wish to question in regard to a crime that has been committed, we would be imputing to the draftsmen of the Rules the intention to prohibit effective police interrogation. We agree with our brethren on the Court of Appeals for the District of Columbia Circuit who cannot believe "that the Supreme Court has forbidden the police to investigate crime." Trilling v. United States, 1958, 104 U.S. App.D.C. 159, 260 F.2d 677, 700 (Prettyman, C. J., speaking for himself and Judges Miller and Bastian).

Nothing, of course, is more offensive to our sense of fair play and our deep respect for the dignity of the individual than unnecessary restraint by the police. Lengthy detention on mere suspicion breeds abuse of those safeguards which a civilized society must erect to protect even the most reprehensible of its members. Careful studies have been made of the unlawful treatment to which the police may subject detained suspects despite the best of intentions, see e. g., American Civil Liberties Union, Secret Detention by the Chicago Police (1959), and we strongly disapprove of these practices. But the possibility that powers given to law enforcement officers may be abused does not require government agents to be left powerless to make reasonable inquiry. The reasonableness

---

2. Although for present purposes the question whether there was an "arrest" is one of federal gloss upon Federal Rule of Criminal Procedure 5(a), it should be noted that detention for questioning would not be regarded as an "arrest" under New York law, since the purpose is not to hold the person detained "to answer for a crime." N.Y. Code of Criminal Procedure, § 167; People v. Marendi, 1915, 213 N.Y. 600, 608, 107 N.E. 1058; Hook v. State, Ct.Cl.1958, 15 Misc.2d 672, 181

N.Y.S.2d 621, 625. If the question were of the validity of an arrest, state law would control. United States v. Di Re, 1948, 332 U.S. 581, 589-590, 68 S.Ct. 222, 92 L.Ed. 210; United States v. Burgos, 2 Cir., 1959, 269 F.2d 763, 766, certiorari denied 1960, 362 U.S. 942, 80 S.Ct. 808, 4 L.Ed.2d 771. But here the question is not of the legality of an acknowledged arrest, but whether, for purposes of determining the applicability of the federal rule, there was an arrest at all.

of their behavior may be assured by close judicial supervision of the methods used. Private citizens who are detained may not, of course, be compelled to answer the questions of the authorities if they wish to remain silent. And the reasonableness of the time for which a person is detained necessarily depends upon his continued willingness to cooperate in answering questions. Most persons, even hardened criminals, will not refuse to cooperate altogether;[3] they are far more likely to talk and make a pretense of cooperation.

Assuming *arguendo* that Vita was from the outset detained against his will, we must determine whether the period of questioning was reasonable under the circumstances, and whether there was a point at which detention was tantamount to arrest and thus subject to the strictures of Rule 5(a).

Vita was questioned initially because the F.B.I. agents had reason to suspect that he might assist them in solving the crime; there is no indication that at the outset they had such probable cause as to require them to go through the formalities of arrest. The first lead the agents had was Vita's statement that he had purchased an automobile with funds borrowed from a former friend, Jane Oakley. Mrs. Oakley was immediately brought to headquarters for questioning, arriving at about noon. She denied that she had lent the money to Vita, and on further questioning told the agents that Vita had admitted to her that he had participated in the robbery. But this statement by itself was a doubtful basis for an arrest without a warrant. See Jones v. United States, 1960, 362 U.S. 257, 269–271, 80 S.Ct. 725, 4 L.Ed.2d 697; Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. No responsible government agency would rely to such extent upon information from a discarded paramour. More persuasive evidence was needed before arresting Vita. In any event, we do not read Rule 5(a) and the McNabb, Upshaw, and Mallory cases as imposing upon federal officers a duty to arrest a suspect as soon as they have but the bare minimum evidence needed to convince a commissioner that there is probable cause to believe that the defendant committed a crime. Although it is usually true that detention for questioning must be completed within a reasonably short time, the circumstances in this particular case justified a more lengthy detention. The investigation was conducted with dispatch, and was essential both to the development of the prosecution's case and to the protection of Vita's rights as a suspect.

To corroborate Mrs. Oakley's story, two agents then went to interview one Calvin Roots, who was incarcerated in the New York City Penitentiary on Rikers Island. Roots had driven with Vita to Miami in the new automobile, and at the trial he testified about admissions made to him by Vita concerning the robbery. Meanwhile, Vita was identified in the line-up before the three bank employees.

█ At this point, at about 4:45 p. m., there was enough evidence to call for an arrest, and the detention after this time was—assuming that it was involuntary—tantamount to arrest. Nonetheless, we hold that the procedure followed by the agents after this point was lawful and proper, as a fruitful investigation was in progress, and valuable momentum was not to be lost. Most of the remaining time prior to Vita's arrest about two hours later was occupied with a lie-detector examination to which Vita had earlier given full written consent. The fourth bank employee finally arrived to participate in the second line-up at 6:12 p. m. By the time these procedures were completed, Vita was on the brink of confes-

---

3. See, for example, United States v. Bufalino, 2 Cir., 1960, 285 F.2d 408 where, of 58 persons who were stopped for questioning about their meeting at Joseph Barbara's estate in Appalachin, New York, in 1957, only one refused to answer any questions at all. Of the 58, about 25 had police records. United States v. Bonanno, supra, 180 F.Supp. at page 76.

**532**

sion, and it took only twenty minutes of questioning, during which his rights were again made clear to him, before Vita was willing to admit his complicity. After the admissions, Vita was formally arrested, and about an hour was spent in reducing his admissions to writing; such delay is not "unnecessary," Metoyer v. United States, 1957, 102 U.S.App.D.C. 62, 250 F.2d 30.

■ We cannot agree with the appellant that federal law enforcement officers are so rigidly confined by Federal Rule of Criminal Procedure 5(a) that they must, immediately upon "arrest," cease all interrogation and formally charge the accused before a committing magistrate. Such an inflexible edict would paralyze the investigative process and eviscerate effective law enforcement.

Of course our concepts of a proper administration of criminal justice and fair play to those suspected of crime require of law enforcement officials that they sedulously observe the rules which have been devised to protect the rights of those in custody whether by way of arrest or by detention for questioning. It is a prime requisite that law enforcement officers must themselves obey the law. At the same time, the public must be protected against bank robbers and law-breakers; the people as well as the accused are entitled to their fair measure of due process by way of effective administration of the criminal laws. We should not go beyond the rules and impose undue restraints upon law enforcement officials where no useful purpose is thereby served.

That thorough investigation is necessary for considered and effective administration of the criminal law is a truism which has its roots in the earliest codes of law. See, e. g., Old Testament, Deuteronomy 13:14, 19:18. It is only in the world of fiction that investigation can be conducted impersonally—that perceptive individuals such as Sherlock Holmes and Hercule Poirot can by some mysterious amalgam of intelligence and intuition solve the most puzzling of crimes and

bring to justice the most devious and evasive of criminals. In the world as it is, face-to-face interrogation is the most useful tool in the discovery and prosecution of law-breakers. See, e. g., Inbau, The Confession Dilemma in the United States Supreme Court, 43 Ill.L. Rev. 442, 448-50 (1948); Inbau, Restrictions in the Law of Interrogation and Confessions, 52 Nw.U.L.Rev. 77, 80–84 (1957); Wickersham, The Supreme Court and Federal Criminal Procedure, 44 Cornell L.Q. 14, 20-22 (1958).

The Franklin National Bank robbery of September 1958 had gone unsolved for fifteen months before the F.B.I., on some information which the record does not reveal, was led to suspect that Vita had participated in it. As we have detailed above, he was then asked to come to F.B.I. headquarters for questioning. It is precisely during such a crucial time, when a suspect is interrogated and responds with denials or explanations, that the law enforcement agents must work with all possible speed to verify what he says and run down the leads which develop in the process. This takes time —often several hours—and it is usually desirable and necessary to question the suspect again about information thus received. It may also be advisable to confront him with someone on whom he had relied for an alibi. The exigencies of the situation will depend, of course, on the particular circumstances.

The policy that underlies the McNabb, Upshaw and Mallory decisions and which is embodied in the command of Federal Rule of Criminal Procedure 5(a) "does not call for mechanical or automatic obedience." Mallory v. United States. supra, 354 U.S. at page 455, 77 S.Ct. at page 1359. The mere fact that a confession has been obtained while the accused is in custody before being brought to a commissioner does not bar use of the confession at the trial. United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140; Lockley v. United States, 1959, 106 U.S.App.D.C. 163, 270 F.2d 915. Mallory has established that any confession obtained while Rule 5(a)

is being violated is inadmissible; but when it is that Rule 5(a) is violated is a question to be decided on the facts of each case. The policy of reasonableness indicates that "arrest" should not include all detention.

The Rule directs that the accused, once "arrested," be brought before a committing magistrate "without *unnecessary* delay." The flexibility of the term "unnecessary" reveals an intent to have the command take effect only if there is no overriding justification for the delay. See United States v. Leviton, 2 Cir., 1951, 193 F.2d 848, 854, certiorari denied, 1952, 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350; United States v. Hymowitz, 2 Cir., 1952, 196 F.2d 819. In Mallory, the Supreme Court said that "circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties." 354 U.S. at page 455, 77 S.Ct. at page 1360. We believe that there are also circumstances which may warrant a detention that is more than "brief"; that when needed for investigation rather than merely repetitious interrogation, reasonable detention is permissible so long as certain safeguards are observed.

██ If the purpose is investigatory, and not simply to keep the accused in custody until he confesses, if the police have good reason to believe that the suspect must be questioned further in order to determine whether he or any other

person ought to be arrested, detention for a reasonable period of time is permissible and any confession obtained during it is admissible. Goldsmith v. United States, 107 U.S.App.D.C. 305, 277 F.2d 335, 343–345, certiorari denied 1960, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 86; Muldrow v. United States, 9 Cir., 1960, 281 F.2d 903. See Rothblatt & Rothblatt, Police Interrogation: The Right to Counsel and to Prompt Arraignment, 27 Brooklyn L.Rev. 24, 47 (1960). So long as the Federal Rules of Criminal Procedure do not designate any period of time during which the police may question a person whom they have reason to suspect of a crime,[4] investigatory interrogation under adequate safeguards should be permitted before the accused is taken to a committing magistrate.[5]

Still assuming that Vita's detention was involuntary, it presents a striking contrast to that in Mallory. In Mallory, the accused was arrested within 24 hours of the time when the crime was committed; there was then "ample evidence from other sources" that he had committed the crime; he was not told of his right to counsel or of his prerogative to remain silent; he was a "nineteen-year-old lad of limited intelligence"; questioning was steady and was met for almost six hours with "strenuous denials"; detention was at police headquarters where "arraignment could easily have been made in the same building"; and the police did nothing more during the delay than continue the steady interroga-

4. Amending the Federal Rules so as to grant time for questioning after the accused has appeared before a commissioner is suggested in Comment, 68 Yale L.J. 1003, 1031–33 (1959). Such an amendment might, of course, somewhat relieve the dilemma of law enforcement officials in some cases. There are many instances, however, when interrogation is begun without reasonable cause to arrest, and it is only during the course of the questioning and contemporaneous investigation that grounds for arrest appear.

5. In Britain, the subject of police interrogation is covered by "Judges' Rules." These provide that when a police officer

is investigating and "endeavoring to discover the author of a crime," he may put questions to anyone from whom he thinks he can get useful information. But once the officer makes up his mind to charge a person with a crime, and once he takes someone into custody, he is obliged to caution the suspect and tell him that he is not obliged to say anything. Broad discretion is given to the courts to enforce the policy behind these rules. See Devlin, The Criminal Prosecution in England 31–62 (1958). But no rule requires the police officer to arrest or bring the suspect before a judicial officer when he has made up his mind that the suspect should be detained.

tion of the suspect. In this case, the suspect was questioned fifteen months after the crime had been committed; there is no reason to believe that the agents then had grounds for his arrest; he was duly notified by the agents of his right to remain silent and retain counsel;[6] he was a twenty-eight-year-old high school graduate who had prior experience with the criminal law; he was detained at F.B.I. headquarters with the nearest United States Commissioner several miles away; the agents started their interrogation in the morning, and pursued it without undue delay while checking leads revealed by Vita's answers and bringing in persons who might identify the bank robbers. There is no support for any claim that the purpose of the questioning was to coerce a confession; Vita was not overborne by any threats or harassment, but was persuaded to confess by others' refutations of his story and by his identification by the bank employees.

We believe that when a continuing process of essential investigation is being carried out expeditiously, when the suspect is advised of his constitutional rights, and when there is no reason to believe that the procedures being followed are used merely as an excuse for delay during which a confession can be extracted, detention is not "arrest," and in any event is not "unnecessary," and an uncoerced confession so obtained is admissible. See Hogan & Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Georgetown L.J. 1, 20 (1958). Our justification for so holding is the overwhelming public interest and the plain unvarnished fact that without such power society would often find itself helpless to solve crimes and protect its members. There is no policy in the law or in common sense which compels us to deprive the government of a confession which is the fruit of expert and speedy investigation carried out with due regard to the rights of the suspect.

It is sufficient protection for the rights of the individual suspect that where, as in this case, the law enforcement officials detain for as many as eight hours, without a formal arrest and charge, the burden of explaining the reasonableness of such conduct should shift to the government. Cf., United States ex rel. Wade v. Jackson, 2 Cir., 256 F.2d 7, 14, certiorari denied 1958, 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158. The usual rule is that the burden is on the defendant to show a violation of Rule 5(a). E. g., United States v. Walker, 2 Cir., 1949, 176 F.2d 564, certiorari denied 1951, 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653. We hold that the government has satisfied its burden in the present case.

In summary, we affirm the district court's finding of fact that Vita came to F.B.I. headquarters voluntarily and stayed there of his own free will in the hope that he could throw the agents off the scent. Alternatively, even if he was in fact detained at some time on December 21, such detention for further questioning did not constitute an arrest and was permissible. And even if the detention became tantamount to arrest, the delay in bringing Vita before a commissioner was not unnecessary.

Vita also contends that his confession was coerced, but he cites no evidence in support of this contention other than his own assertion that he had slept very little during the 72 hours preceding the questioning. The agents denied having any knowledge of the truth of this allegation, and they claimed that during the stay at F.B.I. headquarters Vita gave no indication of being exhausted. He was offered food at various times throughout the day and was never physically assaulted. The district judge quite properly found Vita's claim that he was exhausted

---

6. Vita denied that he had been told of these rights. The trial judge, however, held that "he was advised fully of his rights," and thus resolved the issue of credibility in favor of the testimony of all the agents involved in the questioning. Moreover, the written consent to take the lie-detector examination, which Vita admits to having signed at about 12:45 P. M., stated: "I have been told that I can consult an attorney and that I do not have to consent to this interview [on the polygraph]."

and therefore coerced to be without merit.

The court expresses its thanks to assigned counsel for their able representation of the appellants on the brief and oral argument.

The judgments of conviction of both appellants are affirmed.

WATERMAN, Circuit Judge (concurring).

I concur in the affirmance of both convictions. However, as to Vita, I believe I should make a separate statement.

We all accept the trial judge's determination that Vita voluntarily accompanied the Bureau's agents to the FBI headquarters at Third Avenue and E. 69th Street, voluntarily remained there, and was free to leave there at any time from the moment of his arrival until he voluntarily confessed at 6:30 p. m. Hence there was no denial to him of any right that an accused person is entitled to under Rule 5(a) of the Federal Rules of Criminal Procedure, the cases preceding that rule, or the cases subsequent thereto. Dunn v. United States, 5 Cir., 273 F.2d 470, certiorari denied 1960, 363 U.S. 848, 80 S.Ct. 1625, 4 L.Ed.2d 1731. We all agree that Vita's "detention" began at 6:52 p. m. and that that was the moment when he was first held as an "accused," and that after his confession was then promptly typed and signed he was not questioned further. Hence we all agree that the arraignment early the next morning was not an unreasonably delayed one. So we unanimously conclude that Vita's appeal, an appeal based solely upon a claim that his confession was obtained during an unreasonable detention prior to arraignment, must fail.

It is quite unnecessary for decision here to discuss problems that might be of interest if, against his will, Vita had been taken into custody by the three FBI agents from the sidewalk at Broadway and 31st Street at 10 a. m.; and, against his will, had been transported 43 blocks to the FBI headquarters in an FBI vehicle; and, against his will, had been detained there, against his will put into lineups, against his will fingerprinted, and against his will subjected for some 8 hours to uncoercive questioning. Such a case is not the case before us, and such a case would have to be decided upon its own peculiar, particular facts, one of the most important of which would be the fact of non-cooperation.

Therefore, though I most assuredly concur in affirming Vita's conviction, I wish to make it clear that I disassociate myself from concurring in any portion of the opinion in which, *arguendo*, as an alternative ground to support an affirmance, it is sought to solve *in vacuo* the rights of a hypothetical Vita, unwilling to cooperate with the Bureau step by step as Vita cooperated. It is fundamental that collateral questions ought not to be reached by the courts unless absolutely necessary for a decision of the issues before it. See concurring opinion of Chief Justice Warren in Culombe v. Connecticut, 1961, 367 U.S. 568, 635, 81 S.Ct. 1860, 1897, 6 L.Ed.2d 1037.