**UNITED STATES of America,**
**Appellee,**

v.

**Herbert H. MIDDLETON, Jr., Appellant.**

**No. 389, Docket 29453.**

United States Court of Appeals
Second Circuit.

Argued March 18, 1965.

Decided April 5, 1965.

Moore, Circuit Judge, dissented in part.

Jonathan L. Rosner, New York City, for appellant.

John F. X. Peloso, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Neal J. Hurwitz, Asst. U. S. Atty., on the brief), for appellee.

Before MOORE, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge:

Contending that certain incriminating material was unlawfully obtained by federal officers and therefore inadmissible at his trial, Herbert H. Middleton, Jr., appeals from a judgment of conviction, entered after a non-jury trial, for violating 18 U.S.C. § 641 by stealing a calculating machine belonging to the United States Navy. Found guilty, in the main, on allegedly tainted handwriting specimens and inculpatory statements,

appellant Middleton was sentenced to nine months imprisonment.[1] We find that at least some, if not all, of the incriminating material was obtained during an unreasonable delay in arraignment, in violation of Rule 5(a), Fed.R. Crim.P., and that its introduction at trial compels reversal.

On the morning of September 29, 1964, the calculating machine, valued at over $300, was discovered missing from the fourteenth floor of the Federal Office Building, 90 Church Street, Manhattan. Those charged with investigating the theft (one of a series of burglaries in the building) also found scrawlings on unofficial correspondence in an adjoining office, including the misspelled phrase "yours turly." At approximately 5:00 that evening, Captain Edgar Dibble, the Naval Officer in charge of security on the fourteenth and fifteenth floors, observed Middleton and Gilliam standing near the fourteenth-floor elevator. Dibble asked the two men to identify themselves and state their business. Middleton gave his name and said he was in the building to see a narcotics agent, but Gilliam stood mute. Both were taken to the fifteenth-floor duty office where they were joined by the Lieutenant of Guards, Joseph Giordano, and two Postal Inspection Aides, Edward Lauth and Rudolph Nero.

At approximately 5:15, one of the investigators called the Narcotics Bureau to verify Middleton's story, but was unable to contact the agent he had named, one Cleophus Robinson. Not satisfied with Middleton's explanation of his presence on the fourteenth floor, although the Narcotics Bureau had its offices on the sixth, the officers escorted the two suspects to the Narcotics Bureau to await word from Agent Robinson. At about 5:35, he was reached by telephone and advised the investigating officers that Middleton, an informant, had an appointment to meet with him earlier that afternoon. The agent added, however, that Middleton had visited the Bureau's offices often enough to know that they were not on the fourteenth floor. Soon thereafter, Lauth learned that Middleton and Gilliam had been seen in the building the afternoon before under suspicious circumstances. With this information, Lauth telephoned his superior, Inspector Martin Kogel, who directed that the suspects be held for questioning in the Postal Inspectors' fourth-floor office in the same building.

Between 6:00 and 7:00 p. m., Lauth interrogated Middleton, first advising him of his right to remain silent. After inquiring into Middleton's background and seeking a further explanation of his presence on the fourteenth floor, he requested a handwriting sample. Middleton complied, writing out certain words dictated by Lauth, including "yours truly," which Middleton proceeded to misspell "yours turly." There is no indication that Gilliam was questioned during this period.

At 7:00 p. m. Inspector Kogel arrived and immediately informed Middleton and Gilliam that they need not answer any questions and that anything they said might be used against them. After this admonition, Middleton acknowledged that the handwriting specimen taken previously was his and gave additional calligraphic samples. Kogel questioned Middleton and Gilliam alternately between 7:00 and 9:00; Gilliam balked at answering questions, but Middleton was generally cooperative. During this period both began to suffer narcotics withdrawal syndromes and were given a relief prescription of elixir turpenhydrate, a type of cough medicine with codein, which apparently (and without contradiction by appellant) did not affect voluntariness.

At about 9:00 p. m. Middleton told Lauth that he and Gilliam had stolen the calculator the previous evening. He repeated the admissions to Inspector Kogel, who thereupon sought further instructions from an Assistant United States Attorney. At 10:00, Kogel was

---

1. At the close of the Government's case, the District Court granted a motion for acquittal by Middleton's co-defendant, Charles R. Gilliam, from whom no self-incriminating material was obtained.

authorized to arrest only Middleton and lodge him overnight at Federal Detention Headquarters. Notwithstanding these instructions, Kogel persisted in interrogating Middleton, taking a typewritten, signed confession between 11:00 and 11:45 p. m. It was not until 12:50 a. m. that appellant was lodged in the Federal Detention Headquarters at West Street. After spending the remainder of the night there, he was arraigned before a Commissioner the next morning. At the trial, the handwriting specimens and oral and written statements were admitted in evidence, over objection, and constituted the real basis for Middleton's conviction as shown by the acquittal of Gilliam, who had refused any cooperation from the beginning.

## I.

Rule 5(a), Fed.R.Crim.P., requires "any person making an arrest without a warrant" to "take the arrested person without unnecessary delay before the nearest available commissioner." To insure compliance with this Rule, the Supreme Court has mandated that any evidence taken during an unnecessary or unreasonable delay in arraignment may not be admitted in federal criminal proceedings. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

On the record before us, we find that Middleton was under arrest for some time —beginning at the latest at approximately 7:00 p. m.—before he made the incriminating admissions at 9:00 p. m. After he was taken to Inspector Kogel's office and subjected to considerable interrogation in the constant company of officers and guards, a person in Middleton's position—especially given his youth, low intelligence, and narcotics addiction—must have understood and believed that he was in the power and custody of the officials and therefore under arrest. See Seals v. United States, 325 F.2d 1006 (D.C.Cir. 1963); Kelley v. United States, 111 U.S. App.D.C. 396, 298 F.2d 310 (D.C.Cir. 1961). Indeed, Kogel, the officer in charge, reluctantly admitted, and the Government now concedes, that Middleton, was not free to leave after 5:35. And surely our determination that he was arrested should not hinge on the fact that the officers were not formally "authorized" to arrest until 10:00 p.m.,[2] for the relevant factor to consider on the facts present here is the impression conveyed to the person being held. Otherwise, we can conceive of no sound reason why the defendant would have supplied that most incriminating link—the misspelled specimen.

We also are impelled to conclude that the delay between the time when arrest could have been lawfully made by the accumulation of an almost airtight case[3] and arraignment, when viewed in the context of what transpired, was unnecessary. The Supreme Court has said that an arrested person must be arraigned "as quickly as possible" so that he may be advised, by a judicial officer, of his constitutional right to counsel and of his privilege against self-incrimination. Any period of delay becomes unreasonable if used, as here, "to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging state-

2. Although the concurring opinion expresses disagreement with our conclusion that it would be unreasonable to place the moment of arrest later than 7:00 p. m., no reason is given for pinpointing at 10:00 p. m. other than the suggestion that arrest was not ordered until that time. But if authorization becomes determinative, Rule 5(a) will have a hollow ring for it could be easily circumvented by delaying any request for authority until it also could be joined with news that the accused has confessed.

3. If the arrest were unlawful because not based on probable cause, all statements and handwriting samples taken thereafter might be inadmissible as matter illegally seized in violation of the Fourth Amendment. Cf. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We need not reach that question, however, because whether or not the arrest was lawful, all evidence taken once arraignment was unnecessarily delayed was inadmissible under the Mallory rule.

ments" to support the arrest and ultimately the defendant's guilt; "the delay must not be of a nature to give opportunity for the extraction of a confession." Mallory v. United States, 354 U.S. 449, at 454–455, 77 S.Ct. 1356, at 1359–1360, 1 L.Ed.2d 1479.

As we have already indicated, before 9:00 p. m. when Middleton confessed to the theft, he had given several handwriting samples, which included the highly incriminating misspelling of "yours turly." Moreover, the officers had already verified his story with Narcotics Agent Robinson and both defendants had been identified as having left the building under suspicious circumstances the afternoon before. The persistent interrogation that followed, after the inquiry had shifted from the investigatory to the accusatory stage, cannot be justified in the circumstances of this case and leads us to the inescapable conclusion that it was in furtherance of an effort to make an already airtight case ironclad by the extraction of a confession.[4]

▆▆▆ Although we recognize that Rule 5(a) is not violated by a delay for the purpose of arraigning the defendant before a Commissioner the next morning, United States v. Vita, 294 F.2d 524, 529 n. 1 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); United States v. Ladson, 294 F.2d 535, 537 n. 1 (2 Cir. 1961), cert. denied, 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962), the unavailability of a Commissioner does not license the police to continue their interrogation through the

night. The objective of Rule 5(a) is to check resort to psychologically coercive or "third degree" practices, see United States v. McNabb, 318 U.S. at 344, 63 S. Ct. at 614, and not simply to insure that the accused is arraigned at the earliest possible time. And since the purpose here, at some point after 7:00 p. m., had narrowed to a single objective—to obtain the flat admission from the accused's lips that he had stolen the calculating machine—the delay became unreasonable. See Ricks v. United States, 334 F.2d 964, 968–69 (D.C.Cir. 1964); Coleman v. United States, 114 U.S.App.D.C. 185, 313 F.2d 576, 577 (D.C.Cir. 1962).

We are not unmindful that continued inquiry in some instances even after an arrest may be permissible but here it was not required to verify explanations or run down leads; it was solely a means to elicit a confession. It is interesting to note, for example, that only after Middleton permitted the agents to achieve their goal in securing the confession that he committed the theft did the officers seek authority to lodge him overnight. And even after they were given the desired authority by the Assistant United States Attorney, they waited for a signed typewritten confession before actually lodging him at the House of Detention.

Finally, unlike United States v. Vita, supra, the Government has failed to show the need for pursuing a continuing process of essential investigation, and, even assuming it did, there was no showing that its officers were acting with the necessary expedition. Rather, the record

---

4. We agree with our concurring brother that courts should be wary of using "20-20" hindsight in "second-guessing" the investigator's or prosecutor's determination of when post-arrest interrogation had exceeded permissible limits. But if such over-simplified catchwords are taken too literally, there would be little left for appellate courts to review in criminal cases. Indeed, we might not have such landmark decisions as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), because the result in those cases, as in all appellate decisions in the criminal

law, was to "second-guess" the lower courts and law enforcement officials. Moreover, to understand the function of appellate courts is to recognize that they must determine all questions after the fact, including whether there was probable cause for a search warrant or an arrest, whether the police used coercion to extract a confession, or whether, as here, a delay in arraignment was unnecessary and unreasonable. These determinations are necessary to fulfill the judiciary's historic function of administering criminal justice in the federal courts; otherwise we would be guilty of silent abdication.

permits only one conclusion: the procedures followed were merely excuses for delay during which a confession might be, and was, extracted. Because that confession was admitted into evidence, we reverse on that ground only.[5]

## II.

██ ██ The precise scope of our decision today is, of course, necessarily limited by the particular facts of this case. We continue to believe, for example, that the Mallory exclusionary rule applies not to all statements taken during any delay in arraignment but only where the delay is unnecessary and unreasonable. United States v. Vita, supra; United States v. Ladson, supra. Nor do we question the power of the police, under proper circumstances and while investigating a crime, "to detain suspects for reasonable periods of time in order to question them, check their stories, and to run down leads which either confirm or contradict those stories." United States ex rel. Corbo v. LaVallee, 270 F.2d 513, 518 (2 Cir. 1959), cert. denied sub nom. LaVallee v. Corbo, 361 U.S. 950, 80 S.Ct. 403, 4 L.Ed.2d 382 (1960). This long-recognized prerogative is vital not only to crime prevention and detection, but also "protects those who are readily able to exculpate themselves from being arrested and having formal charges made against them before their explanations are considered." United States v. Vita, 294 F.2d at 530. See also United States v. Bonanno, 180 F.Supp. 71 (S.D.N.Y.1960).

We simply hold that where the detention is unreasonable in length and its purpose is not investigatory, but to keep the accused in custody for an indefinite period until he confesses, statements taken may not be received in evidence at a later trial, particularly where grounds for an arrest or a warrant of arrest existed for some time before the accused confessed. Cf. United States v. Vita, 294 F.2d at 533.

Reversed.

MOORE, Circuit Judge (concurring in part and dissenting in part):

Defendants were found under suspicious circumstances in a federal building where security was of vital importance. Since their presence was not satisfactorily explained, further investigation ensued. This was pursued by representatives of several governmental departments. Time was required. I disagree with the majority's fact finding that Middleton was under arrest beginning at the latest at approximately 7:00 P.M. and that there was no need to attempt to develop further facts.

I do not think that appellate judges, enlightened by the outcome of the trial, should place themselves in the position of the investigator and prosecutor and decide with after-acquired wisdom when the investigatory stage shifts to the accusatory and when the facts are sufficiently developed to make an "ironclad, airtight case." It would indeed be a bold, brash and inexperienced prosecutor or defense counsel who would make such a claim for his case—particularly upon threshold development of the facts.

As for the McNabb-Mallory question, arraignment was made at the earliest possible time—the next morning. However, after Middleton's oral admissions at 9:00 and after the 10:00 order that he be arrested and lodged overnight, the interrogation continued. By that time there could be no purpose other than to elicit a full, formal confession, as was in fact

---

5. Although serious questions are presented with respect to the admissibility of the handwriting specimens, we find it unnecessary to pass on those issues now. The admission of the incriminating oral and written statements which were the fruits of official illegality suffices to taint the judgment of conviction. Whether the handwriting specimens were inadmissible on any of the several grounds advanced by appellant, including an alleged denial of the assistance of counsel who was neither retained nor requested, seems to us an academic question, in the context of this case and in light of our ruling here, because Middleton has already served two-thirds of his sentence, is due to be released July 24, 1965, and it is likely that the Goverment will consider retrial inadvisable.

done. The legitimate ends of reasonable investigation had already been served.

Therefore, upon any new trial, I would exclude the typewritten signed confession taken subsequent to 10:00 P.M. All other statements, including the handwritings, were part of normal investigation required for the protection of the suspect as well as for the public. With respect to cases presenting different facts, I would reiterate the comments of Chief Judge Lumbard in his opinion in United States v. Vita, 294 F.2d 524, 532 (2d Cir. 1961):

> "We cannot agree with the appellant that federal law enforcement officers are so rigidly confined by Federal Rule of Criminal Procedure 5(a) that they must, immediately upon 'arrest,' cease all interrogation and formally charge the accused before a committing magistrate. Such an inflexible edict would paralyze the investigative process and eviscerate effective law enforcement."